NATIONAL LABOR RELATIONS BOARD
v.
GEIGY CO., Inc.
No. 13686.

United States Court of Appeals
Ninth Circuit.
March 17, 1954.
Rehearing Denied April 28, 1954.

George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Samuel M. Singer, Thomas R. Haley, Attorneys, N. L. R. B., Washington, D. C., Nathan R. Berke, Attorney, N. L. R. B., San Francisco, Cal., for petitioner.

Richard Ernst, San Francisco, Cal., for respondent.

Before STEPHENS, BONE and ORR, Circuit Judges.

BONE, Circuit Judge.

The National Labor Relations Board petitions for enforcement of an order issued by it against respondent. The order proceeds upon findings that respondent refused to bargain collectively with General Teamsters Union, Local 431, AFL, (herein "the Union") as the exclusive bargaining representative of respondent's employees, in violation of Sec. 8(a) (5) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(a) (5), and that respondent interfered with, restrained and coerced its employees in the exercise of rights guaranteed in Sec. 7 of the Act, 29 U.S.C.A. § 157, in violation of Sec. 8(a) (1) of the Act, by threatening reprisals and promising benefits to induce their rejection of the Union. The Board's order requires respondent to cease and desist from the unfair labor practices found and any other interference with, restraint or coercion of the employees in the exercise of their rights under Sec. 7 of the Act; to bargain with the Union on request; and to post the usual notices. In its decision and order the Board adopted, with some additions, the findings, conclusions and recommendations of the Trial Examiner.

The primary facts as found by the Trial Examiner and the Board are for the most part undisputed. Respondent operates an insecticide plant near Fresno, California. In June of 1951 respondent's production employees, who were 15 in number and, concededly, constituted a unit appropriate for purposes of collective bargaining, contacted the Union because they were dissatisfied with a recent announcement by respondent's foreman in charge of manufacturing in the plant, Carlton Kauffman, that overtime work was to be halted. Claud Spencer, a Union organizer, met with 13 of the employees near the plant after work on June 29, 1951. All 13 of the employees at the meeting signed cards applying for membership in the Union and designating the Union as their bargaining representative. Several of the employees returned to the plant on the same day and told Kauffman, the foreman, about the meeting.

On the morning of the next work day, Monday, July 2, 1951, Kauffman called a meeting of the employees in the plant. Kauffman began the meeting by saying that he did not think the employees would be benefited by a union. When the employees said that they would join the Union if overtime was not restored, Kauffman replied that he would do his best to get the men back their overtime. He added that if the plant was unionized the employees would probably get no overtime and that the company would probably hire 50 or 60 men to get out production and then operate the plant as a warehouse the rest of the year.

About an hour later Union Organizer Spencer arrived at the plant with Walter Biggers, another Union representative. Spencer told Kauffman the Union represented the employees, presented a form of bargaining contract, and asked Kauffman if he had authority to sign it. Kauffman replied that he could sign the contract if authorized to do so by his superiors, but that he did not think the Union "any longer" represented the employees. Biggers replied that the employees had signed authorization cards and threw a package of the cards on Kauffman's desk. Kauffman suggested a meeting of the employees to determine what they wished, and Spencer and Biggers agreed.

At the ensuing meeting Kauffman and the Union representatives spoke to the employees. Kauffman reiterated the statements he had made to the employees earlier that day. Someone suggested that the employees vote on whether they wanted the Union to represent them. Kauffman and the Union representatives then left the room while a poll was taken of the employees. The result was six votes for the Union, nine against. The Union filed unfair labor practice charges against respondent, and this proceeding followed.

### The Refusal to Bargain

Respondent contends that the Board erred in finding that the Union was the duly authorized bargaining representative of the employees. We have often recognized that a union may be effectively designated as bargaining representative by the signing of authorization cards. See N. L. R. B. v. Trimfit of California, Inc., 9 Cir., 211 F.2d 206; N. L. R. B. v. W. T. Grant Co., 9 Cir., 199 F.2d 711; Zall v. N. L. R. B., 9 Cir., 202 F.2d 499, 501. It is argued, however, that in the instant case the signing of the cards by the employees was intended simply as the initial step toward securing a Board-conducted election at which the employees could express their choice as to representation, and not as a present authorization of the Union to bargain in the employees' behalf. There is some evidence which would support this contention. Both the Union representatives and the employees contemplated that the authorization cards would be used in aid of a petition for a Board election, and the matter of Union initiation fees and dues was put off until after such an election could be held. There is other evidence, however, consistent only with the conclusion that the employees meant to give the Union immediate authority to bargain in their behalf. On each of the cards was the statement: "I hereby designate [the Union] as my agent to bargain collectively for me on wages, hours, working conditions and for a union shop or closed shop agreement." There was also evidence that Spencer told the employees the cards would "give me [Spencer] the privilege or the right, according to the laws, to enter the Geigy Plant and to negotiate in the matter [of overtime work] with the Geigy Plant in your behalf." The Board's finding that the authorization cards constituted effective designations of the Union as the bargaining representative of the employees is supported by substantial evidence on the record considered as a whole, and is therefore conclusive.

Respondent concedes its refusal to bargain with the Union on July 2, but seeks to justify such refusal on the ground that it was motivated by a good faith doubt of the Union's representative status. We think the argument must be rejected. Foreman Kauffman was advised on June 29, 1951 of the meeting held that day at which 13 of the employees had signed Union authorization cards. And when the Union representatives asked him to bargain on July 2, Kauffman did not challenge Biggers' statement that the employees had signed authorization cards, nor did he ask to examine the package of cards shown to him. He said, rather, that he did not think the Union "any longer" represented the employees. It would appear, then, that Kauffman was aware of the employees' selection of the Union as a bargaining agent on June 29, and it is hard to see how Kauffman could reasonably have believed the Union had lost its majority over the weekend of June 29 to July 2, unless he thought his anti-Union statements to the employees on the morning of July 2 had achieved the defeat of the Union. Doubt of the Union's majority based upon the supposed effectiveness of these statements is no defense to respondent. Nor can respondent justify its refusal to bargain on the basis of the informal poll of the employees on July 2, which followed Kauffman's repetition of his anti-Union remarks, and resulted in a vote adverse to the Union. For, as will be seen, Kauffman's statements were coercive and thus violative of Sec. 8(a) (1) of the Act. Respondent cannot, as a justification for its refusal to bargain with the Union, set up a defection of Union adherents which it has induced by unfair labor practices. Medo Photo Supply Corp. v. National Labor Relations Board, 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007.

Respondent's contention that "the consent to an election [the informal poll of July 2] by Local 431 constitutes a waiver of any evidentiary weight in the cards" finds no support in the record.

The testimony of both Foreman Kauffman and Union Organizer Spencer was to the effect that neither respondent nor the Union agreed to be bound by the result of the poll. Indeed, when Kauffman and the Union organizers were waiting to see how the vote was going to come out, Organizer Spencer again asked Kauffman to sign the form of bargaining contract and made it clear that the Union would press for acceptance of the contract irrespective of how the men voted.

## Kauffman's Statements To
### The Employees

██ We turn now to the Board's finding that Kauffman's statements to the employees on July 2 were violative of Sec. 8(a) (1) of the Act. Respondent urges, first, that Kauffman's statements are not attributable to respondent. Respondent points to the fact that Kauffman prefaced his allegedly coercive remarks by saying that he was not speaking for the Geigy Company but only for himself, and that the Company did not care whether the men joined the Union or not. Whether Kauffman's subsequent statements to the employees are to be attributed to respondent depends upon whether the employees might reasonably have believed that in making them Kauffman was acting for and on behalf of management. International Ass'n of Machinists, etc. v. National Labor Relations Board, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 599, 61 S.Ct. 358, 85 L.Ed. 368; N. L. R. B. v. Security Warehouse & Cold Storage Co., 9 Cir., 136 F.2d 829, 833; N. L. R. B. v. Globe Wireless, 9 Cir., 193 F.2d 748, 751. Kauffman was the foreman in charge of all manufacturing at the plant. He had authority to hire and fire employees. He was the representative of management in the plant and the employees looked to him as such. He made the statements at a meeting called by him as foreman. The Trial Examiner justifiably concluded that in these circumstances "The words 'personal opinion' were not sufficiently magic to dispel in the minds of the employees the conviction that it was the representative of their employer to whom they were listening."

██ Kauffman promised the employees that he would try to get overtime pay restored if the Union was rejected. At the same time he threatened "probable" loss of overtime work and a shutdown of the plant for a large part of the year if the plant was unionized. The statements were of a character repeatedly held to be coercive within the meaning of Sec. 8(a) (1) of the Act. N. L. R. B. v. State Center Warehouse & Cold Storage Co., 9 Cir., 193 F.2d 156; N. L. R. B. v. L. Ronney & Sons Mfg. Co., 9 Cir., 206 F.2d 730; N. L. R. B. v. Howell Chevrolet Co., 9 Cir., 204 F.2d 79, affirmed on other points 346 U.S. 482, 74 S.Ct. 214; N. L. R. B. v. Nabors, 5 Cir., 196 F.2d 272. Kauffman's statements were not at all like the "reasonable argument" described in the case of Bonwit Teller v. N. L. R. B., 2 Cir., 197 F.2d 640 on which respondent relies. It is urged that even though the statements, standing alone, might be viewed as having a coercive tendency, they did not in fact have a coercive effect on the employees, but the record as a whole fairly supports the contrary finding of the Trial Examiner and the Board.

### The Board's Order

On February 2, 1953, respondent filed a motion in this court for leave to adduce testimony that there had been a large turn-over in production employees in respondent's Fresno plant, with the result that only a small minority of the persons who had been employed at the time of the unfair labor practices remained in respondent's employ at the time the motion was filed. The object was to show that the Union did not represent the employees at the time of the motion and that the Board's order directing respondent to bargain with the Union was therefore improper. Respondent expressed willingness to consent to a Board-conducted election to determine the employees' choice as to representation. On

February 16, 1953 we entered an order denying the motion (unreported). A similar motion had been made before the Board after issuance of the Trial Examiner's intermediate report and had been denied.

■ In opposition to the Board's petition for enforcement respondent again argues that, because most of its present production employees have never expressed a choice on whether the Union should represent them, the Board's order is "contrary to law" insofar as it directs respondent to bargain with the Union. The same contention has been made in many cases and just as often rejected. See, e. g., Franks Bros. Co. v. National Labor Relations Board, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; N. L. R. B. v. Andrew Jergens Co., 9 Cir., 175 F.2d 130, and cases there cited; Joy Silk Mills v. N. L. R. B., 87 U.S.App.D.C. 360, 185 F.2d 732, 744; Superior Engraving Co. v. N. L. R. B., 7 Cir., 183 F.2d 783, 793, 794. It has been uniformly recognized that it is within the Board's province to require an employer to bargain with a Union even though the Union has lost its majority after the employer's unlawful refusal to bargain. "The Board might well think that, were it not to adopt this type of remedy, but instead order elections upon every claim that a shift in union membership had occurred during proceedings occasioned by an employer's wrongful refusal to bargain, recalcitrant employers might be able by continued opposition to union membership indefinitely to postpone performance of their statutory obligation." Franks Bros. Co. v. National Labor Relations Board, supra, 321 U.S. at page 705, 64 S.Ct. at page 819.

■■ Respondent suggests that the rule of the Franks Bros. case was changed by the Taft-Hartley Act amendment of Sec. 7 of the Act which gives employees the right to refrain from collective bargaining and all other concerted activity.[1] It is urged that the Board's order contravenes that amendment since it forces the employees to bargain through the Union without their consent. We do not agree that the amendment has the effect attributed to it by respondent. The Andrew Jergens, Joy Silk Mills and Superior Engraving cases, supra, were all decided after the passage of the Taft-Hartley Act, yet none recognized any change in the rule of the Franks Bros. case. A study of the cited amendment and its relation to Sec. 8(b) (1) of the Act,[2] together with its legislative history, convinces us that it was designed to protect employees from union coercion in the exercise of their right to abstain from union membership or activity, and not to restrict the discretion of the Board in devising remedies to expunge the effects of employers' unfair labor practices.[3] We find nothing in the amendment or its history

---

1. "Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, *and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)*." (Italicized portion of the section is the amendment in question.)

2. Section 8(b) (1) of the Act reads as follows:
"(b) It shall be an unfair labor practice for a labor organization or its agents—
"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 * * *."

3. In an analysis of the amendment Senator Taft stated that " * * * the Board itself has held that a right to refrain from the exercise of the rights guaranteed in section 7 was always implicit in the Wagner Act [Omitting citation]. The new language, therefore, merely makes mandatory an interpretation which the Board itself had arrived at administratively. The reason for its inclusion was that similar language had appeared in the House bill and since section 8(b) (1) of the Senate Bill, which was retained by the conferees, made it an un-

sufficient to indicate that Congress meant to withdraw from the Board the customary and eminently reasonable remedy here attacked. It must be remembered that "a Board order which requires an employer to bargain with a designated union is not intended to fix a permanent bargaining relationship without regard to new situations that may develop. \* \* \* But, as the remedy here in question recognizes, a bargaining relationship once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed. \* \* \* After such a reasonable period the Board may, in a proper proceeding and upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships." Franks Bros. v. Labor Board, supra, 321 U.S. at pages 705, 706, 64 S.Ct. at page 819.

Finally, it is urged that so much of the Board's order as requires respondent to cease and desist from interfering with, restraining and coercing the employees in the exercise of *any* of the rights guaranteed in Sec. 7 of the Act is too broad. We agree. Respondent's anti-Union activities were not so extensive or of such aggravated character as to evince that attitude of general opposition to employees' rights which would warrant the blanket restraint found in paragraph 1(b) of the Board's order. Cf. May Dept. Stores Co. v. National Labor Relations Board, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145; National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S. Ct. 693, 85 L.Ed. 930. Paragraph 1(b) of the Board's order will be modified so as to require only that respondent cease and desist from "interfering with, restraining or coercing its employees in the exercise of the right to join or assist

General Teamsters Union, Local 431, AFL, or any other labor organization."

As thus modified, the Board's order will be enforced.

---

fair labor practice for labor organizations to restrain or coerce employees in the rights guaranteed them in section 7, the House conferees insisted that there be express language in section 7 which would make the prohibition contained in section 8(b) (1) apply to coercive acts

of unions against employees who did not wish to join or did not care to participate in a strike or picket line." 93 Cong.Rec. 7001. See also House Conf. Report No. 510, on H.R. 3020, 80th Cong., 1st Sess., pp. 39, 40; 93 Cong.Rec. 6600.