**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**L. B. FOSTER COMPANY, Respondent.**

**No. 23121.**

United States Court of Appeals
Ninth Circuit.

Oct. 31, 1969.

Rehearing Denied Dec. 2, 1969.

Frank H. Itkin (argued), Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert E. Williams, Atty., Washington, D. C., for petitioner.

Thomas R. Beech (argued), and Louis Paine, Jr., Houston, Tex., Butler, Binion, Rice, Cook & Knapp, Houston, Tex., Brundage & Hackler, Los Angeles, Cal., of counsel, for respondent.

Before BARNES, DUNIWAY and ELY, Circuit Judges.

DUNIWAY, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order directing that the respondent employer cease and desist from interfering with its employees' rights under section 7 of the National Labor Relations Act, 29 U.S.C. § 157, setting aside a representation election held in December, 1966, which the Teamsters Union lost, and directing the employer to bargain with that union. For reasons that follow, we conclude that the order should be enforced in full.

The Teamsters attempted, beginning in October of 1966, to organize the employees at the employer's pipe yard in Long Beach, California. On October 31, the union secured authorization cards signed by 14 of the 18 employees working at the pipe yard. The Board's cease and desist order was based essentially upon evidence as to the activities of three individuals during the seven weeks from October 31 until the representation election. These were the plant superintendent, Chernove, the assistant plant superintendent, Streetman, and an employee of disputed supervisory status, Synakowski. There is evidence that they actively opposed the union's organizational campaign and that their manner of opposition far exceeded the permissible.

Synakowski, the plant foreman whose capacity as a "supervisor" under section 2(11) of the Act, 29 U.S.C. § 152(11), is strenuously challenged by the respondent,[1] actively fought the union's organizational drive. The Board found that he coercively interrogated employees regarding their union plans, that he attempted to solicit co-workers to reject the union in order to keep their jobs, that he told employees they were being laid off because of their support of the union, and that he threatened to employees that Chernove would close the plant down if it became unionized.

The Board concluded from the foregoing that the employer, acting through Chernove, Streetman, and Synakowski, violated section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by interfering, restraining, and coercing employees in the exercise of their section 7 right to decide whether or not to organize collectively. This determination is conclusive on review by this court, since the factual findings are supported by substantial evidence on the record

---

1. Resolution of the supervisory status of Synakowski is not necessary for the purpose of determining whether the respondent violated section 8(a)· (1). The Board found that the employer *acted through* Synakowski. Since his agency is supported by substantial evidence, his acts are attributed to the employer. National Labor Relations Act § 2(2), 29 U.S.C. § 152(2).

considered as a whole, Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; National Labor Relations Act § 10(e), 29 U.S.C. § 160 (e); Administrative Procedure Act, § 10 (e), as amended, 5 U.S.C. § 706(2) (E). Accordingly, that part of the Board's order setting aside the 1966 election and directing the employer to cease and desist from continuing to violate section 8(a) (1) will be enforced.

 In determining whether we should enforce that part of the Board's order that the employer must, upon request, bargain with the Teamsters Union, we have found it necessary carefully to examine the Supreme Court's recent, extensive discussion of principles applicable to the appropriateness of bargaining orders following the signing of unambiguously worded authorization cards by a majority of employees in a bargaining unit. NLRB v. Gissel Packing Co., 1969, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547. A secret election as contemplated by section 9 of the Act is the preferred method for the determination of whether employees shall be organized collectively, and reliance on authorization cards is "admittedly inferior to the election process." *Id.* at 603, 89 S.Ct. at 1934. Nevertheless, bargaining orders may be proper in situations wherein an employer's unfair labor practices have gone beyond minor violations with minimal impact on the election machinery and have vitiated the will of a majority of employees as expressed through the signing of the cards. In such situations, "cards may be the most effective—perhaps the only—way of assuring employee choice." *Id.* at 602, 89 S.Ct. at 1934. In this respect, we read, at 614–615, 89 S.Ct. at 1940, the following:

> "In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of

past practices and of ensuring a fair election (or a fair rerun) by the use of. traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue * * *."

The Court remanded two of the three cases consolidated for hearing in *Gissel Packing Co.* for further findings by the Board as to whether a bargaining order was necessary or was the preferable remedy in light of the uncertain prospects for protection of the employee's rights by traditional remedies. In the third case, NLRB v. Sinclair Co. (see 1 Cir., 1968, 397 F.2d 157), the Supreme Court affirmed the First Circuit, which had enforced the Board's order to bargain. In doing so, the Supreme Court said (395 U.S. at 615, 89 S.Ct. at 1940–1941):

> "the Board made a finding, left undisturbed by the First Circuit, that the employer's threats of reprisal were so coercive that, even in the absence of an § 8(a) (5) violation, a bargaining order would have been necessary to repair the unlawful effect of those threats."

The actual finding of the Board in *Sinclair* reads as follows:

> "It is recommended that, upon request, the employer recognize and bargain collectively with the union. The same bargaining order would have been recommended even if the record had warranted a conclusion that the employer relied on a bona fide doubt of the union's majority in refusing to bargain with the union. The union represented a clear majority of journeymen wire weavers when the employer began its unlawful campaign directed at destroying the majority. To the extent that the election revealed a loss of union support thereafter, such loss must be found attributable to the employer's unfair labor practices." 1957 CCH NLRB ¶ 21.296, at 27,732.

 In the instant case the Board adopted the findings, conclusions, and

recommendations of the trial examiner, who wrote, as to the necessity of a bargaining order, as follows:

"* * * I * * * recommend, because of the nature and extent of the violations of Section 8(a) (1) of the Act, as herein found, and as a part of the remedy for such violations, that Respondent be required, upon request, to recognize and bargain with the Union in order to prevent it from reaping the benefits of its own misconduct. There can be no question that the Union was the majority representative when it filed the representation petition, having on October 31, obtained valid authorization cards from 14 of the 18 employees in the unit. * * * Even if there be excluded from consideration the nine employees (each of whom had signed a card), that the Regional Director found were lawfully terminated in November, the Union still represented five of the remaining nine * * * on the day of the election. Under the facts of this case, the only logical conclusion is that the Union's failure to obtain a majority in the election was due to the fact that extensive and flagrant 8(a) (1) conduct herein found, and which clearly had for its purpose the undermining of the Union and the destruction of its majority status, had the intended effect. The law so assumes. In such a situation, only a bargaining order will restore the *status quo ante,* and prevent Respondent from reaping the benefits of its unlawful conduct." (Citations omitted.)

We think this finding as complete and persuasive as the finding in the *Sinclair* case. It follows that the *Gissel* decision requires that we enforce the order. See 395 U.S. at 612, n. 32, 89 S.Ct. 1918.

The employer, however, argues that circumstances have changed so drastically that the order to bargain should not be enforced. As indicated in the above quoted excerpt from the opinion of the trial examiner, the Board's Regional Director found that nine of the eighteen employees who had been employed on October 31 had been lawfully terminated prior to the representation election on December 20, 1966. Only five of the remaining nine voted in that election which the union lost by a 3–2 vote, although the union had held authorization cards from a majority of the nine remaining employees. Nearly three years have passed since the union was defeated by the 3–2 vote, and even earlier was the card signing upon which the union claimed its majority status. There is rapid turnover of the respondent's personnel. The Board's Regional Director, from his examination of the respondent's records, found that in the year 1966 alone, "there were 45 employees laid off or terminated, of which only 2 were subsequently rehired." It is not known whether a majority of the employees presently employed desire representation by the Teamsters Union or any other union. It is possible that, as of now, there is not a single remaining employee *who was concerned with the original election.* Thus reliance is placed primarily upon facts occurring after the invalid election, and after the Board's decision.

We do not think that these facts permit us to refuse to enforce the Board's order. The delay is not the fault of the union; if it is anyone's fault, it is that of the employer. But regardless of fault, it is an unfortunate but inevitable result of the process of hearing, decision and review prescribed in the Act. And to deny enforcement, with or without remand for reconsideration on the basis of facts occurring after the Board's decision, is to put a premium upon continued litigation by the employer; it can hope that the resulting delay will produce a new set of facts, as to which the Board must then readjudicate. Suppose that the Board does so, and again finds against the employer. There can then be a petition to this court, a decision by it, and a petition for certiorari to the Supreme Court. By that time there will almost surely be another new set of facts. When is the process to stop?

This case and *Sinclair* both illustrate the possibilities. In *Sinclair*, the election was held December 9, 1965, the Board's order was entered May 12, 1967; the First Circuit ordered it enforced on July 3, 1968; the Supreme Court affirmed on June 16, 1969. In *Sinclair*, there were 14 in the unit; 11 had signed cards; the union lost the election, 6 to 7; there was apparently no evidence as to what had happened thereafter, in 1968 or 1969. There is no hint in the Supreme Court's *Gissel* opinion, either as to *Sinclair* or as to the other cases there decided, that there should be a reconsideration in light of subsequent occurrences.

In our case, the election was in December, 1966; the Board's order was entered in November, 1967; it is now late in 1969. The time period from election to Board order is substantially less than in *Sinclair*, but subsequent delays (including our own in waiting for the Supreme Court to decide *Gissel*) are similar.

Emphasis is given to the rapid turnover in the employer's personnel as a reason for not enforcing the order. But we think that this is a reason to enforce. Otherwise there will be an added inducement to the employer to indulge in unfair practices in order to defeat the union in an election. He will have as an ally, in addition to the attrition of union support inevitably springing from delay in accomplishing results, the fact that turnover itself will help him, so that the longer he can hold out the better his chances of victory will be. That is vividly illustrated here, where the union began with 14 of 18 employees and was down to 5 signers out of 9 in the unit when the election was held.

To appraise the problem in the light of subsequent events is wholly unrealistic. If the employer had not unlawfully interfered with the election, one of two things would have happened. The union might have lost, and that would have ended the matter. The employer was entitled to no more than that possibility. On the other hand, as the trial examiner concluded, the union could have won.

The employer would then have had to recognize and bargain with it. The ability of a union so situated to maintain its position, even in an enterprise where turnover is rapid, is vastly different from its ability to do so where it has lost an election, is not recognized, and can do nothing whatever for the employees. To a union, recognition and bargaining are the be-all and end-all of its existence. See the discussion in *Gissel, supra,* 395 U.S. at 610–613, 89 S.Ct. 1918.

Our decision is supported by the following decisions of this court, in each of which, after long delays in litigation, we enforced a Board order to bargain in spite of substantial changes in the situation occurring after the election: NLRB v. C & C Plywood Corp., 9 Cir., 1969, 413 F.2d 112; NLRB v. Luisi Truck Lines, 9 Cir., 1967, 384 F.2d 842, 847–848. (Seven of ten in the unit signed cards, but the union lost the election. Board bargaining order was enforced three years later, although only one of the original seven was still employed.) Sakrete of No. Calif. Inc. v. NLRB, 9 Cir., 1964, 332 F.2d 902. (Four employees in the unit; all signed cards; all were fired. When offered reinstatement, all refused. Board bargaining order enforced, although none of the original four was employed.) NLRB v. Geigy Co., 9 Cir., 1954, 211 F.2d 553. (Thirteen of fifteen in the unit signed cards; union lost the election, 6 to 9. Board order to bargain was enforced three years later, although "only a small minority" of the original 13 were still employed.) NLRB v. Andrew Jergens Co., 9 Cir., 1949, 175 F.2d 130, 134–135. (The union was certified in 1946; employer refused to bargain; Board order to bargain enforced in 1948, although none of the then employees was a union member.) There are no contrary cases in this circuit.

The Board's order will be enforced in full.

ELY, Circuit Judge (concurring):

I concur in my Brother Duniway's opinion. At the same time, I am com-

pelled to say that, were it not for the compulsion of *Gissel Packing Co.* I could not, in the circumstances of this particular case, join in upholding that portion of the Board's order which requires the respondent presently to bargain with the Teamsters Union. As Judge Duniway points out, the employer is blameless for the rapid turnover in its personnel, and "it is possible that, as of now, there is not a single remaining employee who was concerned with the original election." In the light of these considerations, I would hope that, even though we are obliged to issue an Order of full enforcement, the Board will yet consider itself empowered to determine that the now more desirable course is the conducting of a fair election under the protection of the cease and desist order. Just as it is properly interested in preventing coercive activities which may obstruct the legitimate aims of employees, the Board surely will not desire to thrust upon employees a representative whose status as their bargaining agent is open to serious question.

Professor Bok wrote, approximately five years ago, "But the bargaining order is undoubtedly strong medicine and should, for this reason, be employed with considerable restraint." Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 137 (1964). Not long before the issuance of the opinion in *Gissel*, the Second Circuit had held that a bargaining order should not be enforced unless an employer has exhibited "flagrantly hostile" conduct. NLRB v. Better Val-U Stores of Mansfield, Inc., 401 F.2d 491, 494, 495 (2d Cir. 1968). "The developments in this case demonstrate the vice of imposing a bargaining order long after the occurrence of unfair labor practices that are not refusals to bargain." Id. at 495. See also NLRB v. Flomatic Corp., 347 F.2d 74 (2d Cir. 1965). And the Second Circuit has, very recently and despite *Gissel*, again refused to enforce such an order. NLRB v. Patent Trader, Inc., 415 F.2d 190 (2d Cir. July 29, 1969).