**GENERAL STEEL PRODUCTS, INC.**

and

**Crown Flex of North Carolina, Inc.,**
**Petitioners,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

No. 14316.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 10, 1970.

Decided July 14, 1971.

Lewis P. Hamlin, Jr., Salisbury, N. C. (Kluttz & Hamlin, Salisbury, N. C., on brief), for petitioners.

Elliott Moore, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Stanley R. Zirkin, Atty., N.L.R.B., on brief), for respondent.

Before HAYNSWORTH, Chief Judge, WINTER, Circuit Judge, and THOMSEN, District Judge.

THOMSEN, District Judge.

Petitioners, found by the Board to constitute a single employer, will be referred to collectively as General Steel. In 1964 intervenor, the union, attempted to organize General Steel's employees. Claiming that it held signed authorization cards from a majority of General Steel's employees, it requested recognition and a bargaining meeting. The Board found that the union had obtained valid cards from 120 of the 207 employees in the unit in question. General Steel refused to recognize the union, stating that it did not believe the union's claim of majority status. The union filed a petition for a representation election; an election was ordered and the union was defeated.

The Board then found: (1) that during the union's campaign General Steel had engaged in coercive activity in violation of § 8(a) (1) of the Act; and (2) that General Steel's refusal to bargain was not motivated by a good faith doubt as to majority status, and violated § 8 (a) (5). Thereupon the Board issued an order requiring General Steel to bargain with the union.

On petition to review, this court affirmed the Board's finding that General Steel had engaged in conduct violative of § 8(a) (1), and enforced those portions of the order directing General Steel to cease and desist from coercing its employees and to post appropriate notices. But this court held that the violations of § 8(a) (1) found by the Board were not so extensive or pervasive as to prevent the conduct of a valid secret election, and denied enforcement of the bargaining order.[1] General Steel Products, Inc. v. N.L.R.B., 398 F.2d 339 (1968).

---

1. This court added the following as footnote 3 to that opinion:

"Whether or not the election actually held was properly held invalid, we do not decide, but the § 8(a) (1) violations found to have occurred were not so pervasive that available remedies were not reasonably calculated to assure a free

The Supreme Court granted certiorari, consolidated the case with two other cases from this Circuit and with the *Sinclair* case [National Labor Relations Board v. Sinclair Co., 397 F.2d 157] from the First Circuit, and filed an opinion sub nom. N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). After discussing generally the propriety of a bargaining order as a remedy for a § 8(a) (5) refusal to bargain where an employer has committed independent unfair labor practices which have made the holding of a fair election unlikely or which have in fact undermined a union's majority and caused an election to be set aside, 395 U.S. at 610–613, 89 S.Ct. at 1938–1939, the Court said:

> "Before considering whether the bargaining orders were appropriately entered in these cases, we should summarize the factors that go into such a determination. Despite our reversal of the Fourth Circuit below in Nos. 573 and 691 on all major issues, the actual area of disagreement between our position here and that of the Fourth Circuit is not large as a practical matter. While refusing to validate the general use of a bargaining order in reliance on cards, the Fourth Circuit nevertheless left open the possibility of imposing a bargaining order, without need of inquiry into majority status on the basis of cards or otherwise, in 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices. Such an order would be an appropriate remedy for those practices, the court noted, if they are of 'such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had.' * * *

> "The only effect of our holding here is to approve the Board's use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes. The Board's authority to issue such an order on a lesser showing of employer misconduct is appropriate, we should reemphasize, where there is also a showing that at one point the union had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior. In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue. * * *

> "We emphasize that under the Board's remedial power there is still a third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order. There is, the Board says, no *per se* rule that the commission of any unfair practice will automatically result in a § 8(a) (5) violation and the issuance of an order to bargain. See Aaron Brothers, supra."[2] 395 U.S. at 613–615, 89 S.Ct. at 1940.

The Court noted that in *Sinclair* (the case from the First Circuit) the Board

exercise of the employees' choice by secret ballot rather than by resort to a count of questionable cards." 398 F.2d at 340.

2. 158 N.L.R.B. 1077, at 1079 (1966).

had made a finding, left undisturbed by the Court of Appeals, that the employer's threats of reprisal were so coercive that, even in the absence of a § 8(a) (5) violation, a bargaining order would have been necessary to repair the unlawful effect of those threats. The Board therefore did not have to make the determination called for in the intermediate situation (now usually called the "second category"); i. e., whether the risks that a fair rerun election might not be possible were too great to disregard the desires of the employees already expressed through the cards. The Court further noted that in *General Steel* and the other cases from the Fourth Circuit, the Board had *not* made a similar finding that a bargaining order would have been necessary in the absence of an unlawful refusal to bargain. Nor had it made a finding that, even though traditional remedies might be able to ensure a fair election, there was insufficient indication that an election (or a rerun in General Steel) would definitely be a more reliable test of the employees' desires than the card count taken before the unfair labor practices occurred. The Court also noted that we had ruled in *General Steel* that available remedies short of a bargaining order could guarantee a fair election.[3] The Court said:

" * * * We think it possible that the requisite findings were implicit in the Board's decisions below to issue bargaining orders (and to set aside the election in *General Steel*); and we think it clearly inappropriate for the court below to make any contrary finding on its own * * *. Because

the Board's current practice at the time required it to phrase its findings in terms of an employer's good or bad faith doubts * * * *, however, the precise analysis the Board now puts forth was not employed below, and we therefore remand these cases for proper findings." 395 U.S. at 616, 89 S. Ct. at 1941.

On remand, General Steel filed with the Board a motion for further hearing, to present further evidence and briefing. It alleged that it had had no opportunity to brief or argue before the Board the new issue created by the opinion of the Supreme Court in *Gissel*; and offered to prove "that there was a change of ownership of these Respondents and of the persons responsible for the conduct of labor relations, and such new owners and persons responsible for labor relations were accustomed to dealing with organized labor and had no hostility to the union involved in this case or reason to do otherwise than to recognize rights as established by the Act."

The Board issued a notice granting all parties the opportunity to file statements of position with respect to the matters raised by the Court's remand. General Steel replied, reiterating the position set out in its motion, and stating in greater detail the facts it offered to prove. The Board refused, however, to grant a hearing at which General Steel might attempt to prove the proffered facts. The Board filed a "Supplemental Decision" reciting the history of the case,[4] and stating:

"Having reexamined this case in the light of the *Gissel* guidelines, we re-

---

3. The Court referred to footnote 3 in our former opinion, set out as footnote 1 herein.

4. The Board said:
"In its Decision of March 11, 1966, the Board found that the Respondent violated Section 8(a) (1) of the Act, both before and after the Union's demand for recognition, by engaging in coercive interrogation of employees concerning their union activities; threatening employees with discharge for engaging in such activities or for voting

for the Union; suggesting that unionization might hurt business and make new jobs more difficult to obtain; warning employees that strikes and other dire economic consequences would result if the Union were to win the election; and asserting that, although it would have to negotiate if the Union won the election, the Respondent could negotiate endlessly and would not have to sign any agreement. With respect to the Section 8(a) (5) allegation, the Board found that, (1) the Union had obtained

affirm our earlier conclusion that the Respondent violated Section 8(a) (5), not because Respondent lacked a good-faith doubt as to the Union's majority status when it refused the Union's bargaining request, but because of its refusal to bargain with the Union while engaging in its campaign of unfair labor practices to undermine the Union's support among its employees."

After briefly summarizing the *Gissel* opinion, the Board said:

"We are convinced that a bargaining order is justified in this case. The Respondent's campaign to defeat the Union's organizational efforts consisted of serious and extensive acts of interference, restraint, and coercion as found above. The Respondent's unfair labor practices were so flagrant and coercive in nature as to require, even absent the 8(a) (5) violation we have found, a bargaining order to repair their effect. Our further view is that it is unlikely that the lingering effects of the Respondent's unlawful conduct would be neutralized by resort to conventional remedies which would have produced a fair rerun election. We therefore find that the employee sentiment as expressed through the authorization cards is a more reliable measure of the employees' desires on the issue of bargaining representation than a rerun election, and that the policies of the Act would be better effectuated by a bargaining order to remedy the 8(a) (5) as well as the 8(a) (1) violations.

"Accordingly, we reaffirm the unfair labor practice findings and the remedy provided therefor in the original Decision and Order."

This action by the Board was similar to its action in practically all of the cases remanded as a result of *Gissel*. The apparent unwillingness of the Board to consider seriously the new questions raised by *Gissel* has been sharply criticized. N.L.R.B. v. American Cable Systems, Inc., 427 F.2d 446, at 448, 449 (5 Cir. 1970), rehearing en banc denied, 427 F.2d 449 (1970), cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266; [5] N.L.R.B. v. General Stencils, Inc., 438 F. 2d 894, at 905 (2 Cir. 1971). Compare N.L.R.B. v. Lou De Young's Market Basket, Inc., 430 F.2d 912 (6 Cir. 1970); G.P.D., Inc. v. N.L.R.B., 430 F.2d 963 (6 Cir. 1970); Clark's Gamble Corp. v. N.L.R.B., 422 F.2d 845, 847 (6 Cir. 1970). And see N.L.R.B. v. Kostel Corp., 440 F.2d 347 (7 Cir. 1971), where the Court held that the Board had failed to make the detailed analysis required by *Gissel*, but the Court undertook to make that analysis itself rather than remand the case to the Board.

Two principal questions are presented in this case: whether the Board should have held a hearing to receive evidence and argument on the issues as modified by the Supreme Court in *Gissel*; and whether at such a hearing the Board should consider facts which have developed since the original hearing before the Board.

█ We agree with the Second Circuit in *General Stencils*, supra:

" * * * we do not believe the Court thought that all the Board needed to do in deciding whether to dis-

valid authorization cards from a majority of the employees in an appropriate bargaining unit at the time of its demand for recognition and, therefore, was entitled to represent the employees for collective-bargaining purposes, and (2) as demonstrated by its unfair labor practices, the Respondent's refusal to bargain on and after August 14, 1964, was motivated not by a good-faith doubt of the Union's majority status, but by a desire to gain time in which to dissipate that status, in violation of

Section 8(a) (5). The Board issued a bargaining order to remedy the Respondent's unfair labor practices."

5. After the remand to the Board in *American Cable Systems* and other cases, the Board entered a supplemental decision and order in Gibson Products Co. v. Retail Clerks Union, Local No. 390, 185 N.L.R.B. No. 74 (1970), setting forth the reasons for its disagreement with the Fifth Circuit.

pense with the admittedly superior method of the election process to determine employee sentiment, 395 U.S. at 603, 89 S.Ct. 1918, was, in Judge Goldberg's apt phrase, to use a 'litany, reciting conclusions by rote without factual explication,' NLRB v. American Cable Systems, Inc., 427 F.2d 446, 449 (5 Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970)." 438 F.2d 894, at 901.[6]

A reviewing court should not usurp the functions of the Board; but it should review what the Board has done and see that the Board does not act arbitrarily. A court cannot fulfill its function if the Board does not find the relevant facts and give the court a fair statement of the reason it concludes that a particular action is appropriate. Here the Board declined even to permit an inquiry into the facts which should govern its decision. The parties, the employer and the union, the employees who want the union and the employees who do not want the union, are entitled to a full and fair consideration of the facts and the law by the Board. The supplemental decision in this case does not indicate that such consideration was given.

In *General Stencils*, supra, the Second Circuit vacated the bargaining order and remanded that portion of the case to the Board for further findings and conclusions. The Court said:

"" * * * In this connection the Board may find it desirable to take additional evidence with respect to employee turnover, see NLRB v. American Cable Systems, Inc., *supra*, 427 F.2d at 448 and the dissent of Judge McCree in G.P.D., Inc. v. NLRB, *supra*, 430 F.2d at 965–966, or on other matters—a course that would seem particularly appropriate in light of the fact that the case was tried on the basis of a legal standard different from that now applied." 438 F.2d at 905.

Some of the events General Steel sought to prove on remand had occurred prior to the first hearing before the Board. They were not developed in the record at that time, for they were not relevant to an inquiry about the employer's good faith in his rejection of the proffered card count. The Supreme Court's decision in *Gissel* has made those facts not only relevant but controlling. Whether or not evidence of events subsequent to the original decision of the Board should be considered, each party should have the right to present evidence, cross-examine the other side's witnesses and argue the questions which the Supreme Court has stated now control the case.[7]

Whether at such a hearing the Board should receive evidence of events after the Board's original decision presents a more difficult question. We rec-

6. The Second Circuit opinion continued:
   "* * * Despite the Board's aversion to utilizing its rule-making powers and the conceded impracticability of framing a rule that would cover every possible variation of employer misconduct, this is a situation where Professor Davis' proposal of a rule 'limited to resolving one or more hypothetical cases, without generalizing,' would reveal at least some of the Board's thought processes to unions, employers, and reviewing courts, and would bring about a degree of certainty and uniformity that, as will appear below, does not seem to have been attained. Failing that, there could be an opinion by the full Board illuminating how it meant to apply its *Gissel*-given authority—a course particularly important for an agency that is forced by the press of business so often to delegate its authority to three-member panels. Failing that, the Board should explain in each case just what it considers to have precluded a fair election and why, and in what respects the case differs from others where it has reached an opposite conclusion. * * * *" 438 F.2d at 901.

7. The Board did not suggest that the motion for further hearing did not adequately state the facts which General Steel wished to prove. The Board called on the parties to submit "statements of position" with respect to the issues, and did not in its decision question the adequacy of the statement submitted by General Steel. It simply decided the case on the evidence taken at the original hearing.

ognize the importance of the principles stated in N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), and Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944), and reiterated in *Gissel*, 395 U.S. at 611, 89 S.Ct. 1918, 23 L.Ed.2d 547— that an employer should not be allowed to profit from his own wrongful refusal to bargain. On the other hand, the primary purpose of a bargaining order is not punitive; it is to protect the rights of the employees, and to insure that their wishes will be carried out. The Supreme Court recognized in *Gissel* that a fair election is usually the best way to determine the wishes of the employees.

In this case, as in *American Cable Systems*, supra, the Board refused to consider evidence offered by the Company that later events had made a fair election possible. The Fifth Circuit said:

"* * * The Board's refusal to consider these changes occurring in the intervening years was apparently predicated on the opinion of the Ninth Circuit in NLRB v. L. B. Foster Co., 9 Cir., 1969, 418 F.2d 1. In *Foster* the complaint was made that changes occurring between the Board's original order and the enforcement proceeding made enforcement of the bargaining order inequitable. The court refused to consider those changes and enforced the order based on the Board's original findings. The *Foster* case, however, is distinguishable because although it was decided after *Gissel* it did not involve a remand in light of that case to the Board for additional findings. In the instant case a different situation obtains. The Board's original findings were inadequate under the teachings of *Gissel* and the case had to be remanded to the Board for further findings. We think that on remand the Board should have taken the opportunity to consider the then existing situation at American Cable to determine whether the electoral atmosphere was still so contaminated that a bargaining order was then justified." 427 F.2d at 448.

We do not intimate that in other circumstances the Board on remand should receive evidence of what has happened since the Board's original decision. In this case, however, the employer was successful in this Court in his attack on the bargaining order; and the Supreme Court did not hold that General Steel was a first category case, as it did in the case of *Sinclair;* the Court remanded this case "for proper findings". In these circumstances the Board ought not to limit its inquiry to events occurring prior to the first unfair labor practice hearing, but should receive proof of any material fact occurring up to the date of the new hearing bearing upon a determination whether or not a fair election could be held.[8]

We, therefore, remand this case to the Board for further proceedings not inconsistent with the views expressed herein.

Remanded.

HAYNSWORTH, Chief Judge (concurring):

I join Judge Thomsen in his opinion, but the dissenting opinion of Judge Winter prompts an additional comment.

I fully accept the decisions of the Sixth, Seventh and Ninth Circuits,[1] upon which our Brother Winter relies. They dealt only with a contention that bargaining orders should not be enforced because of employee turnover occurring

---

8. More than employee turnover is involved here. There was a proffer to prove a complete change in ownership and management with a resultant departure by resignation, discharge or demotion, of the perpetrators of the unfair practices. The change, whether effected before or after the unfair labor practice hearing, materially altered the situation, and should be considered by the Board on remand, in light of the principles stated in *Gissel*, quoted above.

1. G.P.D., Inc. v. N.L.R.B., 6 Cir., 430 F.2d 963; N.L.R.B. v. Kostel Corporation, 7 Cir., 440 F.2d 347; N.L.R.B. v. L. B. Foster Company, 9 Cir., 418 F.2d 1.

after commission of the charged unfair labor practices. It was a contention with which the Board had not dealt, and in *L. B. Foster, G.P.D., Inc.* and *Kostel Corporation* there had not even been an attempt to raise the point in the proceedings before the Board.

If all that we had here was a fresh contention of employee turnover, an order enforcing the bargaining order would occasion me no hesitation. If employee turnover alone was enough to deny enforcement of a bargaining order in the usual case, employers, generally, would be provided with an incentive to prolong the proceedings until such turnover had occurred. Moreover, if employee turnover was relevant in the usual case, litigation of the matter might well involve extensive factual controversy over the possible relation of employment terminations to unfair labor practices charged or uncharged. An administrative rule which would generally foreclose litigation of such tangential factual controversies, with a potential to run to huge proportions, may well be justified.

Here the issue arises primarily with respect to a matter which is at once simpler and far more relevant. The employer offered to prove a change of ownership of the plant and the resultant departure from the scene of the former president and all other officials and supervisors who had been involved in the unfair labor practices. The employer also offered to prove that the new management had a history of peaceful and amicable relations with unions.

This proffer is most unlikely to call for an extended factual inquiry. The factual assertions well may not even be controverted. If they are controverted, unlike inquiry into the circumstances of many employment terminations, evidence tending to prove or disprove the asserted facts should call for no more than a very short hearing, and the resolution of any factual controversy should prove neither difficult nor time consuming.

More importantly, however, the proffered facts are much more highly relevant to the *Gissel* inquiry. The departure of all of the old oppressors from the scene would inevitably affect the duration of the sense of coercion their unfair labor practices had created. When the Board considers, as it must under *Gissel,* the likelihood of further unfair labor practices, there hardly could be anything of greater significance than the departure of the old oppressive management and the substitution of new management and supervisory staff with a very different history in dealing with labor organizations.

In the absence of compelling administrative reason, the Board ought not to deprive itself of the opportunity to appraise the prospects for a fair election by looking at the scene at the time of the hearing without an arbitrary limitation to the murkier view available as of the time of the commission of the last charged unfair labor practice. Ordinarily that view should be as of the time of the unfair labor practice hearing.[2] In the usual case the Board should at least have substantial discretionary powers to decline to order further hearings with respect to changing circumstances subsequent to the unfair labor practice hearing. This is one of the cases specifically remanded to the Board for findings under the new *Gissel* standard as laid down by the Supreme Court, however, and in such a case, when the standard changed after the Board's initial decision, I can see no reason why the Board should ignore any event or circumstance which would enlighten the fact-finding process under the new standards whether or not those events occurred before or after the initial unfair labor practice hearing. In the usual case the Board's view, as a practical matter, must be

2. Apparently the change in management occurred before the unfair labor practice hearing, for there are incidental references to such things as the resignation and departure of the former president in the transcript. These were not developed for they had no relevance to the criteria which then governed the Board's decision.

closed at the time of the unfair labor practice hearing, but in this case the Board was specifically directed to take a new look to answer the newly relevant factual questions, and, in doing so, it ought to open the record to any evidence which has potential relevance to those factual issues.

I thus have no quarrel with the cases upon which the dissent relies, but those decisions do not reach this case.

WINTER, Circuit Judge (dissenting):

The majority opinion requires the Board to reopen the record in this case and to receive additional evidence of events occurring both before and after the 1965 hearings and then to make new findings and reconsider its decision. I think the Board's order should be enforced on the present record.

The question of reopening arose in this way: When we remanded after *Gissel,* General Steel moved that a hearing to receive further evidence be held. The Board invited the parties (General Steel, the union and General Counsel) to file statements of position with respect to the issues on remand. General Steel responded, *inter alia,* by asserting (a) that the Board had not at the previous hearing received evidence pertinent to the issues created under *Gissel,* and (b) that, in any event, there had been a change of ownership of General Steel (precisely when it is not alleged), that the new owners were accustomed to dealing with organized labor and had no hostility to the union involved in the case, that there had been a turnover among supervisors so that certain supervisors who had previously committed unfair labor practices were no longer employed or had been demoted to nonsupervisory status, that the former president of General Steel, who was connected with most of the unfair labor practices, had sold his interest in General Steel and left its employ, that there had been such a turnover of employees that only 25 out of 207 of the original members of the bargaining unit were still employed, and that the new employees had not been ex-posed to unfair labor practices or had an opportunity to express their desires as to representation. It was alleged, as a conclusion therefrom, that there was nothing to prevent the conduct of a fair and proper re-run election.

Since the majority requires General Steel's motion to reopen to be granted in its entirety, and thus requires the consideration of additional evidence of events *before* the 1965 hearing, as well as after, a statement of my views requires that I consider each period of time separately.

— I —

With regard to evidence of events prior to the initial hearing, General Steel's motion and statement of position was eloquently silent as to what evidence, available but not adduced at the hearing, had gained new relevance because of the decision in *Gissel,* or how the cross-examination of any particular witness would have been conducted differently if the rules established in *Gissel* had been in effect. The Board declined to reopen the record and to conduct a further hearing. In its supplemental decision, it recited, however, that General Steel had moved to reopen the proceedings, and it (the Board) had considered General Steel's statement of position, together with the entire record, in concluding to order bargaining.

I do not question that the Board has a duty to reopen the record and receive additional evidence on remand when an intervening decision of a court renders relevant that which was known before but not then adduced because not relevant under the then rules of law. But I would not fault the Board's action in this case. The Board's rules, 29 C.F.R. § 102.48(d)(1), are specific that "[a] motion to reopen the record shall state briefly the additional evidence sought to be adduced, why it was not presented previously, and that, if adduced and credited, it would require a different result." To me, this is a reasonable regulation. It regulates practice before the Board in substantially the same manner

that Congress has regulated practice before us. Section 10 of the Act, 29 U.S.C.A. § 160(e), provides that an application to us for leave to adduce additional evidence "shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board * * *." We would not entertain such a motion if the proffered evidence were not described with reasonable particularity, for the obvious reason that materiality could not be determined in a vacuum.

No more, it seems to me, should the Board be required to reopen a record to receive the unknown. The Board's burden of adjudication, like our own, is too great to require it to hold hearings which are not likely to be productive. In essence, the Board's rules require a showing of materiality as a condition precedent to reopening. General Steel failed to carry that burden. It advanced an indisputable reason why the undisclosed evidence had not been previously offered, but it failed to describe the evidence with enough particularity to enable the Board to determine its relevance or probative value.

It is no answer, as the majority argues, that the Board did not specifically rest this part of its refusal to reopen on this ground. The Board did not assign any different, inconsistent reason, and I do not think that we are restricted by the form in which the Board articulated (or, in this case, failed to articulate) its result from dealing with the merits of the motion.

— II —

Next is the issue of events occurring after the initial hearing.

The general rule is well established that, in cases involving an employer's failure to bargain in good faith, a bargaining order must be enforced even if by the time the Board issued its order the union had lost its majority. NLRB v. Katz, 369 U.S. 736, 738 n. 16, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. Mexia Textile Mills, Inc., 339 U.S. 563, 70 S.Ct. 826, 833, 94 L.Ed. 1067 (1950); Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); NLRB v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380 (1942) (per curiam). Under the general rule it would follow that events after a Board's final decision and order (except voluntary full compliance with the order) would be immaterial to the validity of the order and to the correctness of its enforcement. Since such evidence would be immaterial, reopening would not be required.

*Gissel* cited the authorities establishing the general rule and quoted the *Franks* Court's statement that it wished to prevent employers from profiting from their own wrongful refusals to bargain. 395 U.S. at 610–611, 89 S.Ct. 1918, 23 L.Ed.2d 547. Even if *Gissel* is not considered to support the broad proposition that evidence of post-hearing events is immaterial to enforcement, it at least establishes the narrower proposition that evidence of post-hearing events, which were either under the employer's control or which may have resulted from his wrongdoing, are not proper grounds for nonenforcement of a bargaining order. As to such events, *Gissel* would not require reopening.

When I apply the rationale of these cases to the proffered evidence of changed circumstances, I conclude that we should not require reopening. These authorities and their reasoning persuasively rule out the evidence of employee turnover, and the resulting diminution of union strength. There remain only the turnover or demotion of supervisory personnel who committed the unfair labor practices and the sale of the company to owners having an attitude of greater realism in the field of labor relations. I would consider the dismissal or demotion of supervisory personnel immaterial, because it is always within the power of an employer to fire the supervisors who have done the dirty work. If this evidence must be considered, employers could hope to commit unfair labor prac-

tices and then frustrate the Board's petition to enforce a bargaining order by a hasty housecleaning, to the detriment of both finality of proceedings and the deterrent effect of *Gissel*. A rule should not be established to provide this incentive; nor where, as here, the employer alleges "turnover," should a rule be established which would require a separate determination with regard to each departed employee whether or not he left voluntarily or was discharged. A sale of the business presents like considerations and should receive like treatment.

Nevertheless, the majority relies on NLRB v. American Cable Systems, Inc., 427 F.2d 446 (5 Cir. 1970), cert. den., 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1971), in holding that in a *Gissel* case, i. e., one remanded or reconsidered by the Board after *Gissel*, a different rule is to be followed. Additional support for the majority's view is found in NLRB v. General Stencils, Inc., 438 F.2d 894 (2 Cir. 1971); and G.P.D., Inc. v. NLRB, 430 F.2d 963 (6 Cir. 1970) (dissenting opinion, McCree, J.). There are, however, conflicting authorities. In NLRB v. L. B. Foster Company, 418 F.2d 1 (9 Cir. 1969), cert. den., 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970), the court enforced a pre-*Gissel* bargaining order which it found to be supportable under the new *Gissel* standards without remand, stating:

> Emphasis is given to the rapid turnover in the employer's personnel as a reason for not enforcing the order. But we think that this is a reason to enforce. Otherwise there will be an added inducement to the employer to indulge in unfair practices in order to defeat the union in an election. He will have as an ally, in addition to the attrition of union support inevitably springing from delay in accomplishing results, the fact that turnover itself will help him, so that the longer he can hold out the better his chances of victory will be.

418 F.2d at 5. The court went on to point out that it is very difficult for a union to prevent attrition when it is not recognized and able to bargain, as is the case during litigation over the bargaining order. The same result was reached in G.P.D., Inc. v. NLRB, 430 F.2d 963 (6 Cir. 1970); NLRB v. Lou De Young's Market Basket, Inc., 430 F.2d 912 (6 Cir. 1970); NLRB v. Kostel Corp., 440 F.2d 347 (7 Cir., 1971); and Gibson Products Company, No. 15–CA–3244 (NLRB, September 6, 1970).

The majority and the authorities which support it proceed on the argument that since *Gissel* recognized the election route as the preferred means to determine majority employee sentiment, the Court is permitted to direct the Board to determine if laboratory conditions for a new election exist *now*, rather than as of the date the bargaining order would have been effective had the employer not pressed the litigation. I do not think that *Gissel* so holds.

Of course, it is true that *Gissel* recognizes an election as the preferred device for determining representation in industrial democracy. But *Gissel* also recognizes that some employers by their wrongdoing destroy to varying degrees the effectiveness of an election as a means to reflect uninhibited employee desires, so that a bargaining order is justified before an election, or notwithstanding an election in which the union lost. The majority stresses *Gissel's* first holding, but it ignores or slights the latter. The statements of the Court in *Gissel*, in arriving at these holdings, are perceptively analyzed by the Board in *Gibson Products Company, supra,* in which, to me convincingly, the Board concluded that "in determining whether the employer's unfair labor practices are of such a nature as to preclude a fair election and thus necessitate a bargaining order based on a past card showing of majority status, the situation must be appraised as of the time of the commission of the unfair labor practices, and not currently. For, in virtually every case, by the time a Board decision is reached, there is likely to be sufficient employee turnover and other changes to make it arguable, where the employer

has meanwhile refrained from committing new unfair labor practices, that an election held now would be free of the taint of the old unfair labor practices." Succinctly stated, the Supreme Court's indications in *Gissel* that that is the proper rule are its recognition and reaffirmance (1) of the general rule that a bargaining order may issue when it is shown that a union once had a card majority, but had lost it by the time the bargaining order was entered (395 U.S. at 610, 89 S.Ct. 1918, 23 L.Ed.2d 547), (2) that an employer should not be permitted to profit from his own past misconduct or be given an opportunity to disrupt a future election so as to delay his bargaining obligation indefinitely (395 U.S. at 610–611, 89 S.Ct. 1918), (3) that employees may petition for a new election if, after a bargaining order has redressed an employer's past misconduct, they desire to disavow the union (395 U.S. at 613, 89 S.Ct. 1918), and (4) that in *Sinclair,* one of the four cases considered in *Gissel,* the Court affirmed issuance of a bargaining order solely on the employer's past § 8(a) (1) violations without requiring a reexamination of the current election climate, and in the other three suggested that the "requisite findings were implicit in the Board's decisions below to issue bargaining orders," remanding these cases for proper findings (395 U.S. at 615–616, 89 S.Ct. at 1941). I cannot think that the Court would have suggested that the requisite findings were "implicit" in what the Board had already found if it had any notion that the Board was required to reopen the record.

In the most recent expression on the subject, NLRB v. Kostel Corp., *supra,* the Seventh Circuit, cognizant of the conflict between the Fifth Circuit's decision in *American Cable* and the Ninth Circuit's decision in *Foster,* elected to follow *Foster.* It did so because the delay between unfair labor practices and remedial order in which subsequent events may occur is the "unfortunate but inevitable result of the procedure . . . prescribed in the Act;" and "[i]f any party should be penalized for the delay, it should be the employer, since his misconduct occasioned the proceeding. To hold otherwise would permit an employer to escape his duty to bargain with the employees' representative by continuing his unlawful practices or by engaging in protracted litigation." 440 F.2d at 353. The Seventh Circuit also pointed out that, if the effect of its enforcement of a bargaining order would be to require the employer to bargain with a union no longer representing a majority of the employees, the present employees, after a reasonable period, might petition for a new election. *Kostel, Foster, G.P.D., De Young's* and *Gibson* are the authorities which persuade me and which I would follow.

— III —

Under my view of how this case should be decided, I am brought to the question of whether in the record made at the original hearing there was substantial evidence to support the Board's findings that General Steel's "campaign to defeat the Union's organizational efforts consisted of serious and extensive acts of interference, restraint, and coercion," that these unfair labor practices "were so flagrant and coercive in nature as to require * * * a bargaining order to repair their effect," and that "it is unlikely that the lingering effects of the * * * unlawful conduct would be neutralized by resort to conventional remedies which would have produced a fair rerun election." From the findings the Board concluded that "employee sentiment * * * as expressed through the authorization cards is a more reliable measure of the employees' desires * * * and that the policies of the Act would be better effectuated by a bargaining order * * *."

I think these findings are supported by this record and the conclusions justified. To me, there is no warrant for the majority to seize upon the "litany" characterization of Judge Goldberg in *American Cable* or to charge the Board with "apparent unwillingness * * * to

consider seriously the new questions raised by *Gissel* \* \* \*." Of course, if the Board were required to consider evidence of subsequent events, the Board's order would be defective for failure so to do; but under my view of what is the proper record for the Board to consider, the Board's previous findings of the nature and extent of the unfair labor practices fully support the Board's conclusion that this is a *Gissel* "second category" case. I beg to remind the majority that our previous attempt to characterize the unfair labor practices as "not so pervasive that available remedies were not reasonably calculated to assure a free exercise of the employees' choice by secret ballot rather than by resort to a count of questionable cards." (398 F.2d at 340, n. 3), was said by the Supreme Court in *Gissel* to be "clearly inappropriate." 395 U.S. at 616, 89 S.Ct. 1918. More importantly, the Supreme Court suggested that the findings required by *Gissel* to sustain a bargaining order "were implicit in the Board's decisions \* \* \* to issue bargaining orders \* \* \*." 395 U.S. at 616, 89 S.Ct. at 1941.

As found in the earlier proceedings, there were 207 employees in the bargaining unit. Of these 122 had validly designated the union as their collective-bargaining representative. Beginning with the union's initial efforts to organize and continuing through its rejection of the union's request to bargain and up to the eve of election, General Steel embarked upon a course of action which resulted in numerous violations of § 8(a) (1). Employees were coercively interrogated about their union activity; racial discrimination was threatened if the union prevailed; discharge of employees was threatened if they voted for a union or joined in a strike; and employees were told that the employer would not bargain in good faith even if the union were certified. These unlawful acts were committed by General Steel's top executive officer as well as supervisory personnel who specifically (and undoubtedly correctly) represented that they were carrying out General Steel's policy. Notwithstanding these substantial interferences, in the election 83 ballots were cast for the union, 94 against, and 13 were challenged.

When we heard the first appeal in this case, General Steel's counsel conceded that the findings of violations of § 8(a) (1) were supported by substantial evidence although he argued that they were minimal in nature. It is perhaps significant that in this appeal, General Steel advances no alternative argument in its brief that, if the Board's order was not invalid because the Board refused to reopen the record, the present record would not support a bargaining order under *Gissel*, assuming that the Board made findings with the specificity which General Steel contends is required. In any event, I do not decide the case on implied concessions. I am satisfied that the record as a whole contains substantial evidence to support the Board's specific findings of fact and that the Board, employing its expertise, could properly conclude that a bargaining order, rather than a new election, was a proper order.

I would enforce the Board's order.