### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### LLOYD WOOD COAL CO., INC., Respondent.

#### No. 77–2935.

United States Court of Appeals, Fifth Circuit.

Dec. 7, 1978.

Elliott Moore, Deputy Assoc. Gen. Counsel, Michael F. Messitte, Atty., Allison W. Brown, Jr., Supervisory Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

C. A. Powell, III, Harry L. Hopkins, James H. Miller, Birmingham, Ala., for respondent.

Before WISDOM, GODBOLD and TJOFLAT, Circuit Judges.

GODBOLD, Circuit Judge:

The Board found § 8(a)(1) violations, discriminatory discharges of two employees, a discriminatory layoff of the entire work force of the production and maintenance unit, and refusal to bargain. It entered a *Gissel* bargaining order.[1] We enforce on the § 8(a)(1)'s and the discharges. We decline to enforce with respect to the work force layoff and the refusal to bargain.

The employer Wood is a small corporation organized in December 1974 and since engaged in strip mining coal at each of three successive leased sites in Tuscaloosa County, Alabama. The layoffs, which are central to the refusal to bargain findings and the *Gissel* order, began during June 1976, when the company started phasing out operations at its second lease site, the Cassidy lease. All or substantially all of the employees laid off were recalled in late August and early September 1976 as the company resumed operations at its new (and third) site, the Aland lease. The Board found that Wood closed

---

1. *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

the Cassidy site and laid off the work force until the Aland site began operating in order to avoid unionization of the work force and to implement threats to close the Cassidy strip mine if it "went union." There are Board findings, supported by sufficient evidence, that show antiunion bias and activities and threats to close down the Cassidy mine. But when the record as a whole is considered the ultimate finding that the Cassidy operation was closed for antiunion motives is not supported by substantial evidence.

The Cassidy tract was a rocky, hilly site with an unusually thick rock overburden over the coal. For two or three months after it was opened in the spring of 1975 it was profitable, then it became a disaster. The company had one customer, an electric utility, for the low grade "steam coal" produced. Soon after the mine opened the price of this coal dropped by one-third, and the customer reduced its purchases from 20,000 tons a month to a low of 5,000 tons. In November 1975 the company's accountant recommended that the company sell the Cassidy operation (the company's only mine) because of the continuing losses. In January 1976 the company gave to Killian & Associates, an Arizona broker specializing in coal leases, an exclusive listing to sell the Cassidy lease. The broker introduced various prospects in early 1976. The company's accountant met with numerous prospects between January and July 1976. Negotiations began in March with Carbon Energy, Inc., a New Mexico corporation. Wood introduced into evidence a rough draft of a proposed option which, its president testified, was submitted to him by Carbon Energy. This eight-page typed instrument is a formal document of a type and in content usually prepared by legal counsel. It describes in detail the terms of a proposed sale. Earnest money of $250,000 was required to be placed in escrow. The option

was to last for 15 days but could be extended for an additional 15 days. Wood was required to attach as an exhibit a list of the machinery and equipment used in its business as of April 30. The proposed purchase price was $1.5 million cash (including the earnest money), payment or assumption of liens and indebtedness on machinery and equipment not to exceed $1.5 million, plus installment payments of $750,000. The proposed agreement contained provisions naming, and protecting, Killian as broker. Numerous handwritten interlineations and changes were made on this document. The president of Wood testified that he referred the document to his lawyers who redrafted it and submitted the redraft to Carbon Energy.[2]

Returning to other events in the chronology, Wood's activity with respect to the Aland tract began during April 1976, when it began "prospecting surveys" on the site. Union activity at the Cassidy mine began with a small organizational meeting on May 15 and another meeting on May 30. In late May the company became aware of the organizational effort. The § 8(a)(1) activity occurred in late May and early June and the two discharges between June 5 and 10. The union claimed a card majority, and demanded recognition, on June 9.

Meanwhile negotiations with Carbon Energy had come to fruition with the execution in late May of a formal written option to Carbon Energy to purchase 85% of the company's stock. This agreement is in evidence.[3] It is dated May 24, but notarized acknowledgments show that it was signed by officers of Carbon Energy in New Mexico on May 24 and by officers of Wood in Alabama on May 28. Earnest money of $250,000 is again provided for. Carbon Energy is given 38 days to exercise the option, and if it did exercise the closing date is to be July 7. There is also in evidence a check

2. Counsel for Wood offered the redraft into evidence, stating that it had been prepared in his office, for the purpose of showing that it contained a proposed execution date of "the _____ day of April," but the ALJ rejected this as evidence.

3. Exhibits to the agreement were not offered because, counsel for the company stated, they would reveal financial and tax data that the company considered confidential, but counsel offered to produce the exhibits if the ALJ required them.

payable to the broker for the $250,000 earnest money.

Wood's accountant, a witness credited by the Board, testified that he was familiar with and participated in the negotiations with Carbon Energy, furnished financial information to its representatives, and was present when the option agreement was signed.

By the end of May the company had operated the Cassidy lease at a loss for 10 successive months, and its total loss on this lease was more than $250,000. For April and May 1976 alone the loss was over $200,000.

Beginning around June 12 Wood started phasing out the Cassidy mine and began to lay off the work force as and when no longer needed. Final shutdown was about June 29.

Carbon Energy did not give notice that it would exercise the option.[4] Wood acquired a lease on the Aland tract in early July, according to its president. It contracted for engineering, testing, core drilling, preparation of maps, and surveying work on the Aland tract, and these activities went on during July and August. In August the company began transferring its equipment from the Cassidy site to the Aland tract. As work began at the new location employees were recalled, and by some time in September the recall was total.

The company president testified that the Cassidy mine had been continued at a loss on the advice of the broker that it would be more saleable if operational, and that the phase out was begun with the concurrence of Carbon Energy. Wood's accountant testified that several times before June 1976 he had recommended that the Cassidy mine should be closed.

### The § 8(a)(1)'s

The ALJ found and the Board adopted eight instances of § 8(a)(1) violations. The employer does not contest the following:

(1) Foreman McCrosky's interrogation of employees William Estes and Don L. Edwards, late in May, about their union interests, McCrosky's comment to Estes that "if the Union came in . . . we would lose our jobs" and McCrosky's proposal to Estes that he urge his fellow employees to meet with President Wood to keep the Union out of the mine.

(2) McCrosky's disclosure to Estes, in the latter part of May that he was keeping a tabulation of the employees as to whether they were for or against the Union, thereby giving the impression that the management was engaging in surveillance of the employees' union and concerted activities.

(3) McCrosky's comment to employee Don L. Edwards, about the first of June that "he believed . . . Mr. Wood would close the mine before he would let it go Union."

(4) McCrosky's interrogation of employee Stanley Tawbush on about May 24, and of employee Neil McCay on about June 5, as to whether either of them knew anything about the employees' signing cards.

(5) McCrosky's remarks to Tawbush late in May when he admonished the latter that the employees should have gone to Mr. Wood rather than the Union as well as his further comments that it was likely that Wood would shut down the mine and auction off his equipment in which event Tawbush would have difficulty getting another job with a nonunion employer.

(6) Superintendent Don Murphy's interrogation of employees Robert Richardson and Charles Martin as to whether they had signed authorization cards . . . . . .

■ The employer admits that Superintendent Murphy told employees that Wood was going to shut down "because the men were stabbing him in the back." The record adequately supports an inference that this remark related to union activity and was therefore a violation of § 8(a)(1).

---

4. Because, according to the testimony of Wood's president, Carbon Energy had decided to purchase a mine in the Southwest and could not finance both acquisitions.

The record also sufficiently supports the finding that § 8(a)(1) was violated by Wallace McCay's telling employees the mine would be closed if they signed union authorization cards.

The company questions the finding of unlawful interrogation of employee Branch on the basis of contradictions in testimony. This type of issue is peculiarly the province of the Board.

### The § 8(a)(3)'s

The company does not contest the finding that discharge of Stanley Tawbush violated § 8(a)(3). The finding of discriminatory layoff or discharge of Neil McCay has satisfactory evidentiary support. The company's argument that McCay's termination was part of the overall layoffs brought about by closing the mine is fully met by the ALJ's discussion of the point and the credibility choices he made.

### The layoffs

The linchpin of the Board's decision that the layoffs were pretextual is its acceptance of the General Counsel's theory that Wood never intended to sell the Cassidy operation, that the proposed sale to Carbon Energy (described by the Board as "purported dealings" with Carbon Energy) was an elaborate stratagem, part of an overall scheme to circumvent unionization. This conclusion is not supported by substantial evidence. The company documented its losses from the Cassidy mine, and the Board accepted the figures. The Board accepted the testimony describing the shortcomings and difficulties of the Cassidy site. Wood documented the listing of the Cassidy lease for sale and the proposals and counterproposals involving Carbon Energy, all occurring before the union activity began.[5]

There is no significant evidence to support an inference that the documentary evidence of proposals and counterproposals, and the executed agreement with Carbon Energy, are a sham. The Board ignored this substantial documentary evidence and concluded that the transactions with Carbon Energy were "purported dealings." The ground it gave for this conclusion was that the oral testimony of the company president concerning the Carbon Energy transaction was vague and lacking in particulars, especially with respect to the date when Carbon Energy "decided to let the option to purchase lapse." The particulars of the transaction, including the date the option would expire, are supplied, of course, by the documents themselves, and there was no reason for the president to restate orally what the documents showed. The documents are consistent with the president's testimony that he learned around the first of July that Carbon Energy would not exercise its option. No evidence supports any inference that Wood learned at any earlier time that Carbon Energy did not intend to exercise the option.

When it is recognized that no substantial evidence supports the "sham" theory, other pieces of evidence then fall into place. Preliminary work at the Aland tract in April, acquisition of a lease on it, and engineering, mapping, and testing work on it during July and August, are consistent with an objective of getting rid of the Cassidy albatross and beginning operations anew at a better site.[6] By documentary evidence Wood established that during July broker Killian was still trying to sell the property. In mid-July Wood sent coal samples to potential purchasers in Canada, Pittsburgh and West Virginia who were being approached by Killian.

The company's purchase in May of several new trucks and loaders is not inconsistent

---

5. Since the earliest employee interrogation is only identified as "in the latter part of May," it is unclear whether when the negotiations with Carbon Energy culminated in the written contract the company had any knowledge of union activity. The Board made no finding on this specific point. We do know, however, that most of the § 8(a)(1)'s and both of the § 8(a)(3)'s occurred after the option to Carbon Energy had been signed.

6. The same applies to the testimony of an employee who when laid off on June 29 was told that he would be recalled when operations reopened at a new location.

with a purpose of selling out the Cassidy mine and reopening at a new location. The equipment was movable and usable at another site.

The Board found the layoffs were inconsistent with past company policy that employees were not laid off when one site was closed down and another opened. There is not substantial evidence of such a company policy. When the Cassidy lease was closed down Wood had been in business a year and a half and Cassidy was its second mining site. Moreover, there was testimony that in the move from the first site to Cassidy a partial layoff had occurred. The Board neither rejected nor noted this testimony. Also, we know that the Aland site was not ready for operations to begin. Comparing the move to Aland with the earlier move to Cassidy proves little unless one knows whether, when the first move was made, Cassidy was ready for use.

In view of the finding that the company did not intend to sell the Cassidy lease and that the dealings with Carbon Energy were part of an elaborate subterfuge, the Board abused its discretion in refusing to reopen the record. As soon as the ALJ's decision came out the company moved to reopen, attaching affidavits and documentary evidence tending to show that in November 1976 it had executed an agreement to sell the Cassidy lease to a subsidiary of Louisiana Land and Exploration, a large energy company. The Board ruled that no reason was given to reopen. Since the bona fides of intent to sell the Cassidy lease was a central issue, actual sale within a few months was highly relevant.[7]

### The Gissel order

With the finding of discriminatory mass layoffs out of the picture, what is left are the § 8(a)(1)'s concerning interrogation and an effort to create the impression of surveillance; discharges of two employees, with one of them rehired or recalled in less than 48 hours; threats to close the mine if it went union, followed by an actual shut

down which, under the substantial evidence, was not shown to be for discriminatory motives; and prompt recall of all the employees laid off. These circumstances are not so serious and extensive as to support a *Gissel*-type order. *NLRB v. American Cable Systems, Inc.*, 414 F.2d 661 (CA5, 1969).

Enforcement of the Board order is GRANTED in part and DENIED in part.

---

7. The president of Wood testified that there had been negotiations with Louisiana Land and others, beginning in July after the Carbon Energy option expired.