CHROMALLOY MINING AND MINERALS ALASKA DIVISION, CHROMALLOY AMERICAN CORPORATION, Petitioner Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent
Cross-Petitioner.

No. 78–3410.

United States Court of Appeals,
Fifth Circuit.

July 10, 1980.

Milling, Benson, Woodward, Hillyer, Pierson & Miller, Michael J. Molony, Jr., H. H. Hillyer, III, New Orleans, La., for Chromalloy Mining.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Richard M. Fischl, Atty., Washington, D. C., for the N. L. R. B.

Before WISDOM, GOLDBERG and HENDERSON, Circuit Judges.

WISDOM, Circuit Judge:

In this case the National Labor Relations Board held that an employer committed unfair labor practices, including threats to shut down operations, discriminatory refusals to recall employees, and a promise of a benefit to one employee, all of which caused the union to lose its representation election. We hold that substantial evidence supports the Board on all but one of the unfair labor practices. Accordingly, we affirm the Board's decision and enforce its chosen remedy, a bargaining order.

### I.

### Background

Chromalloy Mining and Minerals, Alaska Division, Chromalloy American Corp. operates a barite mine and processing plant at Castle Island, Alaska. The mine operates on a seasonal basis. During its peak of operations in 1976 Chromalloy had three management personnel and approximately 17 other employees on the island. The work force declined during the winter of 1976–77 to one employee who acted as a watchman. The 1977 peak work force consisted of two management personnel and eight other employees.

During the summer of 1976 an employee, Donnie M. Moore, began to solicit other employees on behalf of the International Union of Operating Engineers, AFL–CIO. On August 13 a Union representative wrote the company stating that 12 of the 17 employees had signed union authorization cards requesting recognition for collective bargaining purposes. On August 16 the Union filed a petition with the Board seeking a representation election.

Testimony revealed that several times during this initial organization period Wallace Dolph, the plant manager, warned the employees that the company might shut down if they joined a union. When Jimmie W. Thompson, the foreman, was asked by three employees what would happen if the employees organized a union, he told them: "Well, they may have to shut the operation down because they can't afford to pay the hourly wage and the benefits." Moore testified that Dolph told him on August 20 that no one was to talk about the Union anymore and anyone "talking Union" on company time would be terminated.

When Dolph resigned and left the island in September, Thompson was promoted to plant manager. John Murgas, manager of Alaska operations for Chromalloy, conducted two employee meetings in the fall during which he criticized labor unions and spoke of several benefits to employees the company planned to introduce.

The Board held a representation hearing during Fall 1976, but lost the transcript of that hearing. The Regional Director issued a Decision and Direction of Election on November 12, scheduling the election for the next seasonal peak in the work force. By late June 1977 there were eight employees. The Board scheduled the election for June 29.

■ Two weeks before the election Murgas held an employee meeting and again criticized unionization. Two employees remembered his expressing a belief that Chromalloy would shut down the mine if the Union was approved. Other employees did not recall such a statement. Two other employees stated that he made similar statements to them in private conversations. The night before the election Murgas told one employee that he would like to send him to a school that would teach him to operate heavy mining equipment.

Of the eight employees eligible to vote in the election, three voted for the Union and four against it. On July 5, 1977, the Union filed objections to the company's conduct affecting the election.[1]

---

1. The Board requires that objections to an election be filed within five days, excluding Sundays and holidays. N.L.R.B. Rules and Regulations, 29 C.F.R. § 102.69(a). Chromalloy argues that the Union's objections cannot be considered because they arrived on the sixth day, July 8. The union's letter and its certificate of service were dated July 5, the third day. The

On May 1, 1978, an administrative law judge found that Chromalloy had undermined the election process by refusing to recall two employees who had worked the prior year, threatening several times to close the plant, and promising benefits to one employee. The ALJ found that these actions constituted violations of §§ 8(a)(1), 8(a)(3), and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* He concluded that "[t]he foregoing unfair labor practices are so substantial and pervasive and have so wholly disrupted and subverted the election process that a fair election cannot be conducted and the only remedy sufficient to correct them is an order requiring Respondent to recognize and bargain with the Union". 238 N.L.R.B. No. 94 at 22. On September 29 the Board adopted the ALJ's decision. 238 N.L.R.B. No. 94 at 1–2. Chromalloy has asked this Court to review and set aside the Board's order; the Board has petitioned for its enforcement.

### II.

### *Threats to Close Down the Plant*

Two employees testified that during a June 15, 1977 meeting Murgas stated that in his opinion Chromalloy would shut down the plant if the Union won. Another employee who was not present at the meeting testified that later the same evening Murgas visited him and discussed the election. Murgas "said something that his personal opinion would be that if we lost our election we might close down our operation because the prices of the pallets and our long-range moving and such would not make it feasible". Another employee, Bruce Benitz, testified that the night before the election Murgas warned him, "You know, we have a union election tomorrow and if the Union goes through you can probably all start

looking for new jobs because there is no doubt in [my] mind that the Company [will] shut down the mine if the Union go[es] through."

Chromalloy denied that Murgas stated during the meeting that the company would shut down if the Union won. It cites testimony by Murgas, one management employee, and three employees in the bargaining unit, all of whom stated that Murgas did not discuss closing down in connection with the election. Instead, they remembered his stating that if a certain land preservation bill passed Congress the plant might have to shut down. Murgas did not remember making any statement about closure of the plant to Benitz the night before the election.

■ Chromalloy argues that the ALJ erred in crediting the testimony of those employees who said that Murgas predicted that a Union victory would cause the plant to close. But it is not for this Court to second guess the credibility choices of an administrative law judge and the Board. "A court of appeals is generally bound to accept the credibility choices of an administrative law judge as adopted by the National Labor Relations Board. . . . When the issue is simply one of believability, we will not overturn the decision of the administrative law judge, who had the opportunity to hear the testimony and view the witnesses, unless the findings are self-contradictory." *NLRB v. Florida Medical Center,* 5 Cir. 1978, 576 F.2d 666, 671; *accord, Helena Laboratories Corp. v. NLRB,* 5 Cir. 1977, 557 F.2d 1183, 1187. The Board's decision here is also supported by uncontradicted evidence that during the prior summer Dolph and Thompson warned that the plant might shut down if the employees joined a

envelope bore a July 6 postmark, the fourth day. The Board accepted the certificate of service as conclusive evidence that the letter was mailed on July 5 and concluded that the Union acted with due diligence. It relied on two cases in which objections were mailed on the fourth day but a post office delay prevented them from being received until the sixth day. *See Gruber's Supermarket, Inc.,* 201 N.L.R.B. 612 (1973), *enforced in relevant part,* 7 Cir. 1974,

501 F.2d 697; *Rio de Oro Uranium Mines, Inc.,* 119 N.L.R.B. 153 (1957). As the Court of Appeals for the Tenth Circuit held in another case involving application of this rule, "we must respect the wide discretion of the Board, to determine in any case whether an exception should be made to its prescribed rules and regulations". *NLRB v. Ideal Laundry & Dry Cleaning Co.,* 10 Cir. 1964, 330 F.2d 712, 718. Its discretion was not abused here.

union. Although events more than six months before filing of a complaint cannot be considered unfair labor practices, 29 U.S.C. § 160(b), evidence of such events is admissible because "earlier events may be utilized to shed light on the true character of matters occurring within the limitations period". *Local Lodge No. 1424, International Assoc. of Machinists v. NLRB,* 1960, 362 U.S. 411, 416, 80 S.Ct. 822, 826, 4 L.Ed.2d 832, 838. The pattern of earlier threats of a plant shutdown lends credence to the testimony about similar statements during the period immediately prior to the election.

■ The appropriate standard for reviewing a Board finding that statements about plant closure constitute an unfair labor practice is whether "the Board could reasonably conclude that the intended and understood import of that message was not to predict that unionization would inevitably cause the plant to close but to threaten to throw employees out of work regardless of economic realities". *NLRB v. Gissel Packing Co.,* 1969, 395 U.S. 575, 619, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547, 581. Murgas made no mention of economic realities during his statements at the June 15 meeting and to Benitz. These statements therefore constitute unfair labor practices. His only comments about profitability and business necessity were made when he told one employee that if the Union won, "the prices of the pallets and our long-range moving and such would not make [operating the plant] feasible". But he never gave any reason why the prices would go up. This Court has held that prediction of plant closure in the event of a union victory constitutes a coercive threat if the statement is "unaccompanied by a proven causal link to specific union economic demands". *NLRB v. Mangurian's Inc.,* 5 Cir. 1978, 566 F.2d 463, 466. *See generally* Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act,* 78 Harv.L.Rev. 38, 78–79 (1964). Murgas provided no such causal link.

## III.
### Promises of Benefits

■ On the night before the election, after predicting that the mine would shut down if the Union won, Murgas told Benitz that the plant was buying a front-end loader and that he would like to send Benitz to a special school to be trained in the operation of the device. Benitz replied that such training "would be real fine". Murgas had never before mentioned sending Benitz to a training school, and he never brought it up again. The Board contends that mention of the proposal the night before the election is a promise of a benefit, and, as such, constitutes an unfair labor practice.

The grant or promise of new benefits during an election campaign has long been forbidden. "The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." *NLRB v. Exchange Parts Co.,* 1964, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435, 439.

Chromalloy contends that the mention of a training school to an employee does not constitute a promise of a benefit. Whether such a promise offends the law depends on the circumstances. Benitz considered it a benefit. And Murgas must have known that was a natural reaction, because Benitz responded that training "would be real fine". This Court has upheld the Board's finding that a "subtle intimation of advancement for workers who rejected the union" constituted unlawful interference with the § 8(a)(1) rights of employees to organize and bargain collectively. *NLRB v. Big Three Indus. Gas & Equipment Co.,* 5 Cir. 1978, 579 F.2d 304, 309, *cert. denied,* 1979, 440 U.S. 960, 99 S.Ct. 1501, 59 L.Ed.2d 773. Significance of the training school reference looms larger in the context of the discussion: Murgas had just warned of a plant closure should the Union win. He followed this "stick" with the "carrot" of advanced training. Given that increased

mechanization of the plant had decreased manpower needs, Benitz could be expected to believe that the opportunity of operating a front-end loader might help him keep his job. We therefore find no basis for overturning the Board's holding that Chromalloy violated § 8(a)(1) by offering Benitz the benefit of training school.

## IV.

### The Discriminatory Refusals to Recall

Employee Donnie M. Moore was a principal supporter of the Union. He instigated talk among the employees about the desirability of Union representation, asked the Union for its help in organizing the employees, and passed out union authorization cards for the other employees to sign.

Management personnel soon learned that Moore was a Union supporter. Dolph told him "that as long as *he* was there there would be no Union" (emphasis added). Two weeks later Dolph instructed him that "there would be no more talk about Union on company time; anybody talking Union on company time would be terminated". Jimmie W. Thompson, former foreman and plant manager of the barite operation, testified that Murgas talked with him about his desire to get rid of employees who supported the Union. He added:

> Well, after they lost the transcripts from the hearing, or whatever it was they had, there was quite a delay and the Union had decided not to hold an election until we got a full complement of crew the following year. And we decided, John [Murgas] and I, that the best thing to do is the ones we figured were in on this Union, they wouldn't be back. We would try, you know, unless they were an asset to our operation we couldn't afford to bring them back. After the layoffs in the winter the ones we needed and had to have we would call back in the spring. The ones we didn't we couldn't call them back.

They discussed Moore at that time.

In October Moore and another employee, Michael Musewski, volunteered to perform weatherproofing work during the winter on the stockpile of barite that Chromalloy kept at Kenai. Murgas agreed to give them a leave of absence and to allow them to perform the work as independent contractors. Before the contract was signed Murgas and Thompson discussed the Kenai operation. Thompson testified that during that conversation Murgas told him they would not be rehired. Thompson stated, "[W]e had to give them a layoff so they could take the contract, the idea being that they wouldn't be rehired by the company." He added, "Oh, well we agreed that anyone we figured was pro-Union would not be returning in the spring because we already knew they wouldn't have an election until the following spring when we had a full complement of men." In another conversation Murgas and Thompson again discussed getting rid of Moore and Musewski.

When Moore signed the contract he asked Thompson whether he would still have a job in the following spring. Thompson replied, "[T]he plant would probably be shut down by the time we finish our contract job for the winter, but we still had a job there".

After signing the contract, Moore and Musewski went to Kenai to weatherproof the barite. Bags of barite had been stacked on 4,250 wooden pallets, which were arranged in a large stockpile. The two employees were supposed to cover each pallet with a wax-impregnated cardboard box and secure the box with special plastic strips. The contract required them to box the pallets by December 15.

Bad weather soon beset them. The temperature was often sub-zero and the winds were severe. Sub-zero conditions caused the material to split. The pallets had been constructed out of wet lumber and had been salted down before they were transported. Consequently, they stuck together during the freezing weather and would pull apart when lifted. Moreover, the previous crew had stacked the barite improperly.

Ted Brown, Alaska manager of Imco Products, the Chromalloy customer who bought much of the Kenai barite, went to Kenai and noticed that many of the barite

bags had become frozen. He told Moore and Musewski "that the work they were doing was redundant because they were going to have to redo it. Someone was going to have to rework the material in the spring and the boxes that they were putting on were going to the point where they could not be used again." Moore testified that Brown told him to stop working. Brown testified that when he made his second and third trip to Kenai the weather conditions had worsened, and "I was amazed that they were still doing the work. . . . "[I]t had become very cold, pallets were freezing down, it was the wrong time of the year, in my estimation".

Although Brown believed that their work was useless, Murgas ordered Moore and Musewski to continue working. Murgas made three trips to Kenai to check on their progress and to discuss problems with the work. Moore testified that Murgas never said he was dissatisfied with their work; indeed, "[e]very trip he came he told us we was doing good for what we was doing". Moore testified that during Murgas's third visit, they asked him for an increase in their pay from $2 per packet to $5 per packet because of the onerous weather conditions. He refused. They replied "that our contract was coming due and that we could not continue with what he had. That we was going to go home on our contract date." Murgas then paid them off for the completed work.

Murgas testified that when he returned from this trip he and Elmer Barton, his superior, agreed not to consider rehiring Moore and Musewski the next year on the ground that they had not completed the contract. According to Moore, however, Murgas told him that he had a job: "I asked John [Murgas] if I still had a job out there when they opened up and he told me I did. . . . I believe John told me [the operation would start again] sometime after April and he would probably bring me

and Ole Nordgren out 30 days prior to get some maintenance done before they start the Island up." This conversation apparently took place after the Murgas-Barton conversation. And in January Thompson told him he was still employed: "I asked him if I still had a job there and he said yes I did have a job there, my work was plenty satisfactory with him. He also told me that he would possibly bring me and Ole Nordgren out 30 days early to start a maintenance program." [2]

Moore and Musewski were never recalled. When operations resumed in March 1977, Chromalloy operated with a smaller number of employees because it had suspended its underwater barite mining operations. Nevertheless, by June it had hired eight employees including a new mechanic and at least one other new employee.

Some time before the election Chromalloy gave the Union a list of employees eligible to vote. The Union then informed Moore that his name had been omitted and advised him to telephone the Company to ascertain his employment status. About two weeks before the election he spoke to Murgas's secretary, who said she would have Murgas return his call. He never did so. On June 26, three days before the election, Moore received a notice in the mail, stating "termination—position no longer needed". Murgas had signed and dated it April 1, 1977. The notice stated that the termination date was December 18, 1976. The envelope was postmarked June 25, 1977.

The Board's complaint against Chromalloy originally alleged only that Moore's discharge was unlawful. At the hearing the General Counsel moved to amend the complaint to include Musewski. The ALJ granted the motion and refused to allow Chromalloy more time for research on the defense to that charge. Although he stated that he would reopen the proceedings if Chromalloy could demonstrate prejudice, no such motion was ever made. [3]

---

**2.** Murgas testified that his conversation with Barton took place some time between December 15th and 20th. Moore testified that his conversation with Murgas took place after December 20th and before January 1st.

**3.** Chromalloy contends that the administrative law judge erred by not granting it a continuance to research evidence regarding the Musewski discharge. "[M]atters of continuance rest in the sound discretion of the hearing offi-

At the hearing Chromalloy contended that Moore and Musewski had not been rehired because they left the Kenai work unfinished. Murgas also testified that 15–20 percent of the barite at Kenai had been damaged by forklifts. Repairing the damage necessitated tearing off the bindings, removing the box, tearing off the plastic shrink wrap, pulling apart all 40 bags of barite, and restacking them in separate pallets. Murgas contended that the damage had occurred only to barite pallets stacked by Moore and Musewski. When Murgas informed Barton of the damage in May 1977, "he blew his top. I can't remember the exact words, of course, but the general concensus [sic] was a reaffirmation of what was discussed back in December of '76 about Moore and Musewski, keeping a very clear distance from them." Chromalloy also contended that it had no affirmative recall policy and therefore that employees had the duty to seek reemployment if they desired it. Moore did not reapply during the spring. He first expressed interest in reemployment when he called Murgas two weeks before the election to inquire about his employment status. Musewski never reapplied for work. Indeed, he did not testify at the hearing and there was no evidence that he would accept a job if it were offered.

■ The administrative law judge held that both refusals to recall constituted unfair labor practices.[4] The ALJ credited Thompson's testimony that he and Murgas had agreed not to recall prounion employees, including, specifically, Moore and Musewski. He concluded that the company's stated reason for not rehiring them, their

failure to complete the Kenai job, was merely an excuse. He pointed to Murgas's and Thompson's statements to Moore that he still had a job and to the late dating and even later mailing of the termination slip. The ALJ found "very little reason" to connect Moore and Musewski with the forklift damage, pointing to testimony by Brown that he noticed no such damage when he conducted a close inspection of the material in mid-November. Brown stated that had he seen such damage he would have pointed it out to them "[b]ecause this particular type of boxing here, with the damage, is a real thorn in the side to me as a salesman in this particular line because I'll instantly hear from the customer that pallet goes to".

The ALJ concluded that there was a "very high probability" that the damage was done during loading or moving the barite and that the two employees were not responsible. Moreover, he noted that the damage was discovered long after Murgas supposedly made his decision not to rehire the employees. The ALJ was unsure whether Musewski was not reemployed because he was considered a prounion voter or an innocent bystander sacrificed to legitimate the refusal to rehire Moore. In either event, the refusal to recall Musewski constituted an unfair labor practice.

■ An employer often has mixed motives for discharging an employee who has been active as a union organizer. This Court has developed a strict standard in evaluating an alleged discriminatory discharge or refusal to recall:

> [A]lthough justifiable grounds may abound, a discharge is unlawful even if it is 'partially motivated by the employee's protected activity. . . .' Moreover,

cer or examiner and his decision should ordinarily not be interfered with by a reviewing court except upon a clear showing of abuse of discretion". *NLRB v. Air Control Prod.*, 5 Cir. 1964, 335 F.2d 245, 247; *accord, NLRB v. Hackenberger*, 6 Cir. 1976, 531 F.2d 364, 365, *cert. denied*, 1976, 429 U.S. 830, 97 S.Ct. 92, 50 L.Ed.2d 94. No error was committed here as the judge gave Chromalloy the option of making a motion to reopen the hearing if further evidence was found. At any rate, the objection

is moot, given that we are reversing the Board's finding that Chromalloy committed an unfair labor practice by failing to recall Musewski.

4. Although the usual § 8(a)(3) violation involves a discriminatory discharge, a discriminatory refusal to recall also violates the proscriptions of the section. *See; e. g., NLRB v. Collier*, 5 Cir. 1977, 553 F.2d 425; *NLRB v. Plymouth Cordage Co.*, 5 Cir. 1967, 381 F.2d 710.

we are mindful that whatever conclusions we might reach were the issue before us *de novo*, it is not our place to 'displace the Board's choice between two conflicting views' even if we would be justified in deciding the issue differently were it before us in the first instance. For it is the Board which has peculiar 'competence . . . to weigh the significance of the raw facts of conduct and to draw from them an informed judgment as to the ultimate fact.' *NLRB v. Big Three Indus.*, 5 Cir. 1974, 497 F.2d 43, 49 (citations omitted). We cannot say that the Board erred in concluding that Chromalloy did not recall Moore because he was "believed to have supported union representation and would have voted in favor of union representation in the upcoming Board election".[5] 238 N.L.R.B. No. 94 at 22. Moore was a leading Union supporter, as evidenced by his initiating conversations about organizing the employees, asking the Union for assistance, and distributing union authorization cards to his fellow workers. Chromalloy's bias against unionization and against Moore strongly imply that his activities on behalf of the Union caused the company not to recall him. As this Court concluded in another case, " 'anti union bias and demonstrated unlawful hostility' were 'proper and highly significant factors for Board evaluation in determining motive' [for employee discharges]". *NLRB v. Durant Sportswear, Inc.*, 5 Cir. 1966, 358 F.2d 729, 730.

The Board did not abuse its discretion by rejecting evidence that Moore was not rehired because of his work at Kenai. Besides direct evidence against Chromalloy's position, damage to the barite could not have been the reason for Moore's dismissal. As the administrative law judge recognized, the damage was not discovered until May 1977, after the date of Moore's termination, April 1.

Substantial evidence supports the Board's finding that Chromalloy committed an unfair labor practice by not rehiring Moore.

The Board also found that Chromalloy committed an unfair labor practice by not recalling Musewski. The Board produced no evidence that Musewski ever wanted to be rehired. Moore, not Musewski, asked in November whether he still had a job when he returned from Kenai. Thompson stated that both employees would be reemployed. Musewski was not with Moore in December and January when Moore asked Murgas and Thompson if he still had a job. No testimony at the hearing indicates whether Musewski was available for employment, present in Alaska, or even still alive. Assuming that the Board has not proved that Chromalloy had an affirmative policy of rehiring employees and that Musewski never expressed any interest in reemployment, the unfair labor practices relating to his recall cannot be sustained. As this Court held in *NLRB v. Collier*, 5 Cir. 1977, 553 F.2d 425, 428, "[H]aving antiunion animus by itself does not violate section 8(a)(3). There must also be proof that the employer had an opportunity to and did in fact discriminate." Sufficient evidence exists to show discrimination against Moore; he was told three times that he would be reemployed. But there is no evidence that Chromalloy had an opportunity to discriminate and did discriminate against Musewski.

### V.

### *The Bargaining Order*

■ The Board issued a bargaining order because, as the ALJ stated, "no fair election

---

5. Chromalloy objects to the adverse inference the ALJ drew because it refused to turn over to the General Counsel certain dossiers compiled by Murgas on the employees. *See* 28 N.L.R.B. No. 94 at 16. Chromalloy contends that the documents were protected by the attorney-client privilege. The documents were originally sent to Robert Christopher, Chromalloy's corporate counsel. They were later given to John F. Groth, an industrial relations employee, who acted as its representative in lieu of counsel at the hearing. Given that Groth obtained copies of the dossiers and that the record is unclear concerning the purpose for compiling the information and the extent of its distribution, it is also unclear whether they are still protected by the attorney-client privilege. We need not decide this question because of the existence of substantial other evidence that Chromalloy discriminated against Moore because he was a union supporter.

could have been held on June 29, 1977, and no fair election can be held in the future for the acts that occurred within the Section 10(b) period are serious and flagrant". 238 N.L.R.B. No. 94 at 20. The Board has a broad discretion in choosing the proper remedy. *Fibreboard Paper Prod. Corp. v. NLRB,* 1964, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233, 241–42. "It is for the Board and not the courts, however, to make that determination [whether to impose a bargaining order or merely a cease and desist order], based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *NLRB v. Gissel Packing Co.,* 1969, 395 U.S. 575, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547.

■ The *Gissel* decision established a new classification system for determining whether the Board should issue a bargaining order. In " 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices", a bargaining order is warranted even if the union cannot demonstrate that it once was supported by a majority of the employees in the unit. *Id.* at 613–14, 89 S.Ct. at 1940. A bargaining order is appropriate in "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes" only if the union once had majority support. *Id.* at 614, 89 S.Ct. 1940. A bargaining order is never appropriate in cases marked by "minor or less extensive unfair labor practices" that have a "minimal impact on the election machinery". *Id.* at 615, 89 S.Ct. at 1940. The Board did not state in which of the first two categories this case fit. Here, however, a majority of the employees signed union authorization cards. The bargaining order should be upheld therefore if the Board has met the second, lesser standard of "less pervasive practices" that "have the tendency to undermine majority strength and impede the election processes".

Chromalloy contends the bargaining order is inappropriate because the Board has not stated specifically why a bargaining order is necessary in this case and because it did not consider the effect of employee turnover on the chances for a fair election. The specificity requirement was first developed in *NLRB v. American Cable Sys.,* 5 Cir. 1970, 427 F.2d 446, *cert. denied,* 1970, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266. There this Court required the Board to make specific findings rather than merely giving "a litany, reciting conclusions by rote without factual explication". *Id.* at 449; *accord, NLRB v. General Stencils, Inc.,* 2 Cir. 1971, 438 F.2d 894, 901–05. The requirement was further explained in a later case:

> The Board is under an obligation to articulate its reasoning and to distinguish factually similar cases with contrary results. . . . Proper findings and conclusions would have explicitly considered traditional remedies such as a cease and desist order, posting or mailing of a remedial Notice to Employees, or other remedies known to the Board, and would have articulated the Board's reasons supporting its conclusion that only a bargaining order would suffice to remedy the unfair labor practices. . . . The purpose of *Gissel* is that the Board, before taking the serious step of issuing a bargaining order, carefully examine the effect of unfair labor practices upon electoral conditions . . . . Further, since the ultimate inquiry is whether a fair election can be held, the Board must also determine what effect the various traditional remedies at its disposal would have on the disturbed conditions.

*NLRB v. Gibson Prod. Co.,* 5 Cir. 1974, 494 F.2d 762, 766–68.

Here, as in *American Cable* and *Gibson Products,* the Board has ignored the specificity requirement. Its only statements about the severity of the unfair labor practices are quoted below:

> By the refusal to recall employees and by its threats and promises, Respondent

committed conduct which clearly had a tendency to undermine the Union's majority strength and to impede the election process. Both threats of closure and unlawful discharges have traditionally been found to constitute unfair labor practices of such a serious nature as to justify a bargaining order as the only effective remedy to vindicate employee rights. . . . [I]t is clear to me that no fair election could have been held on June 29, 1977, and no fair election can be held in the future for the acts that occurred within the Section 10(b) period are serious and flagrant. . . .

238 N.L.R.B. No. 94 at 20. The first and third sentences are examples of the "litany" condemned by Judge Goldberg in *American Cable*; the second is devoid of citation or other supporting authority. Nonetheless, here, as in *Gibson Products*, we may provide the necessary analysis to avoid further delay. *NLRB v. Gibson Prod. Co.*, 5 Cir. 1974, 494 F.2d 762, 768–69; *accord, Peerless of America, Inc. v. NLRB*, 7 Cir. 1973, 484 F.2d 1108, 1119–20; *NLRB v. Ship Shape Maintenance Co.*, D.C.Cir. 1972, 474 F.2d 434, 442 & n. 23.

The Board found that three times during the statutory period Chromalloy executives made threats to shut down the plant in the event of a Union victory. The Supreme Court upheld the bargaining order in *Sinclair Company v. NLRB*, one of the four cases subsumed under *Gissel*, solely on the basis of threats to close the plant. *NLRB v. Gissel Packing Co.*, 395 U.S. at 587–89, 618–20, 89 S.Ct. at 1926–27, 1942–43. The Court recognized that threats to close or transfer plant operations "are more effective to destroy election conditions for a longer period of time than other [types of unfair labor practices]". *Id.* at 611 n. 31, 89 S.Ct. at 1938. Courts of appeal in other circuits have also held that a threat to shut down a plant can by itself justify a bargaining order. *See Amalgamated Clothing Workers v. NLRB*, D.C.Cir. 1975, 527 F.2d 803, 807; *NLRB v. General Stencils, Inc.*, 2 Cir. 1971, 438 F.2d 894, 902. "A threat to close the plant, when made in the context of the union organization of the employees,

has long been recognized as one of the most potent instruments of employer interference with the right of employees to organize under the National Labor Relations Act." *Chemvet Laboratories, Inc. v. NLRB*, 8 Cir. 1974, 497 F.2d 445, 448. One of the threats to shut down in this case was made at a company meeting. The other two were made to individuals. While ordinarily a threat made to a single individual is not a serious unfair labor practice, it assumes significance here because the Union lost by one vote.

We have also upheld the Board's findings that Moore was the victim of a discriminatory refusal to recall and that Benitz was promised a benefit. Although each of these is but a single instance of unfair interference with employee rights, they are important here because of the closeness of the election and the small size of the bargaining unit. *Cf. NLRB v. Marsellus Vault & Sales, Inc.*, 2 Cir. 1969, 61 Lab.Cas. ¶ 10,382, at 17,348.

■ "In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future." *NLRB v. Gissel Packing Co.*, 395 U.S. at 614, 89 S.Ct. at 1940. Chromalloy's unfair labor practices warrant a bargaining order. Not only were there three threats of plant closure, possibly the most serious type of unfair labor practice, but the company also promised benefits to one employee and fired perhaps the most active Union supporter. Moreover, these unfair labor practices must be viewed together with the misconduct occurring the previous fall—predictions of plant closure, promises of benefits, and a scheme to discharge Union supporters. Although none of these can be considered unfair labor practices because they occurred before the statutory six month period, they do demonstrate a prior history of employer resistance to unionization. This history suggests that violations may occur in the future. The

likelihood of recurrence, together with the existence of extensive unfair labor practices, meets the Supreme Court standard for a bargaining order; that is, "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun [election]) by the use of traditional remedies, though present, is slight and employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order". *NLRB v. Gissel Packing Co.*, 395 U.S. at 614–15, 89 S.Ct. at 1940.[6]

Chromalloy also contends that the bargaining order cannot be upheld because of turnover occurring after the company committed unfair labor practices.[7] Before *Gissel,* Supreme Court decisions uniformly held that the Board could ignore subsequent events when deciding whether to issue a bargaining order. *NLRB v. Katz,* 1962, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230, 238–39 n. 16; *Franks Bros. Co. v. NLRB,* 1944, 321 U.S. 702, 703–06, 64 S.Ct. 817, 818–819, 88 L.Ed. 1020, 1022–24; . *NLRB v. P. Lorillard Co.*, 1942, 314 U.S. 512, 513, 62 S.Ct. 397, 86 L.Ed. 380, 382–83. Although *Gissel* did not specifically address the question of subsequent events, the case has been read both to support and to oppose

consideration of such events. 31 Stan.L.Rev. at 511–12 (1979).

Such subsequent events could include employee turnover, *see, e. g., NLRB v. Ship Shape Maintenance Co.,* D.C.Cir. 1972, 474 F.2d 434, 443; *Clark's Gamble Corp. v. NLRB,* 6 Cir. 1970, 422 F.2d 845, 846–47, *cert. denied,* 1970, 400 U.S. 868, 91 S.Ct. 100, 27 L.Ed.2d 108, as well as changes in management which suggest that the employer will no longer commit unfair labor practices, *see, e. g., General Steel Prod. v. NLRB,* 4 Cir. 1971, 445 F.2d 1350, 1356 n. 8; *NLRB v. American Cable Sys.*, 5 Cir. 1970, 427 F.2d 446, 448, *cert. denied,* 1970, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266.[8] Of course, neither necessarily demonstrates that a fair election can be held. An employer can create turnover by terminating employees who support unionization. *See General Steel Prod. v. NLRB,* 4 Cir. 1971, 445 F.2d 1350, 1357 (Haynsworth, C. J., concurring). Similarly, an employer could order or encourage supervisors to commit unfair labor practices and then fire them, "frustrat[ing] the Board's petition to enforce a bargaining order by a hasty housecleaning, to the detriment of both finality of proceedings and the deterrent effect of *Gissel*". *Id.* at 1360 (Winter, J., dissenting).

---

**6.** Chromalloy contends that the unfair labor practices in this case are no worse than those perpetrated in *NLRB v. Lloyd Wood Coal Co.,* 5 Cir. 1978, 585 F.2d 752, where the Board's request for enforcement of a bargaining order was refused. That case involved threats, discharges of two employees, and threats to close operations followed by an actual shutdown. But there most of the unfair labor practices took place before the union secured a card majority. *Id.* at 754. The sequence of events suggested that the employees were not so cowed by the unfair labor practices that they feared to support the union; the subsequent card majority thus weakens any contention that the company's conduct "tend[ed] to undermine majority strength". *NLRB v. Gissel Packing Co.,* 395 U.S. at 614, 89 S.Ct. at 1940. Moreover, the Board had not provided substantial evidence that the plant was shut down for discriminatory motives, and all of the employees laid off were recalled within three months. *See* 585 F.2d at 755, 757.

**7.** During the oral argument the Board's representative argued that Chromalloy waived this objection because it did not raise it before the

Board. *See* 29 U.S.C. § 160(e). Chromalloy did, however, raise this contention in its "Exceptions on Behalf of Respondent Employer to the National Labor Relations Board of the Administrative Law Judge's Decision and Order". There it stated: "34. That the Administrative Law Judge erred by concluding the Union has continued to represent a majority of Respondent's employees since August 13, 1976."

**8.** Unfair labor practices occurring after the election are a different kind of subsequent event. They are always relevant because they demonstrate that the employer is still opposed to unionization. Therefore, consideration of such events has been approved by the Board, *see, e. g., CBS Records Div.,* 223 N.L.R.B. 709 (1976); *Consolidated Rendering Co.,* 161 N.L.R.B. 1 (1966), *enforced,* 2 Cir. 1967, 386 F.2d 699, and by the courts, *see, e. g., J. P. Stevens & Co. v. NLRB,* 5 Cir. 1971, 441 F.2d 514, 520 n. 11, *cert. denied,* 1971, 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59; *NLRB v. Drives, Inc.,* 7 Cir. 1971, 440 F.2d 354, 367, *cert. denied,* 1971, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185.

The Board has consistently opposed consideration of subsequent events. *E. g.,* *Bandag, Inc.,* 228 N.L.R.B. 1045, 1045 n. 1 (1977), *enforced,* 5 Cir. 1978, 583 F.2d 765; *Gibson Prod. Co.,* 185 N.L.R.B. 362 (1970), *supplemented by* 199 N.L.R.B. 794 (1972), *enforcement denied,* 5 Cir. 1974, 494 F.2d 762; *Vaca Valley Bus Lines,* 179 N.L.R.B. 641 (1969). *See* Foss & Kobdish, *Gissel* *Packing and Bargaining Orders, Or: A* *Funny Thing Happened on the Way to the* *Election,* 41 Geo.Wash.L.Rev. 44, 82–85 (1972). The courts of appeals have disagreed about the propriety of considering subsequent events, and those courts which hold that such evidence is admissible disagree about the particular stages of litigation at which consideration of subsequent events is appropriate. The disagreement exists because the subsequent events controversy involves a conflict between two primary goals of labor law: deterring employer misconduct and effectuating employee free choice. If the Board or the courts consider events occurring after an employer's refusal to recognize the employee-supported union, employers might be encouraged to commit practices that delay or even wholly avoid their bargaining obligation because subsequent events may ensure that their violations will not result in a bargaining order. On the other hand, if the Board and the courts ignore such events as employee turnover and issue a bargaining order, workers employed after the union's recognition campaign would be represented by a bargaining agent they never voted for and may not favor. *See* note, *"after all,* *tomorrow is another day": should subse-* *quent events affect the validity of bargain-* *ing orders?* 31 Stan.L.Rev. at 508–09, 512–21.

In the *American Cable* decision this Court held that the Board must consider evidence of subsequent events in a case that has been remanded by the circuit court:

> [O]n remand the Board refused to look at the contemporary necessity for such an order, satisfying itself with a jejune regurgitation of the Company's 1965 waywardness. We deem such findings insufficient under the teachings of *Gissel* to justify a 1970 bargaining order. *Gissel* does not apply a nunc pro tunc principle, giving the then sins of the Company a now application. It requires contemporaneity—a present view, albeit with an historical prospective. Industrial democracy should be allowed to work its will if the present conditions are sufficiently antiseptic for an election. On the other hand, if the employer's 1965 violations of § 8(a)(1) and (3) have a 1970 existence, *Gissel* commands the issuance of a bargaining order.

*NLRB v. American Cable Sys.,* 5 Cir. 1970, 427 F.2d 446, 448–49, *cert. denied,* 1970, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266. Later cases make clear that a case should not be remanded to the Board for consideration of events occurring after the Board's hearing but before the enforcement proceeding. *NLRB v. Gibson Prod. Co.,* 5 Cir. 1974, 494 F.2d 762, 766 n. 4; *J. P. Stevens & Co. v.* *NLRB,* 5 Cir. 1971, 441 F.2d 514, 525 n. 16, *cert. denied,* 1971, 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59.

Recently this Court held that the Board must consider evidence of events occurring between the election and the administrative law judge hearing, but need not reopen the case to hear evidence of events occurring between the hearing and the Board's review of the administrative law judge's decision. *Bandag, Inc. v. NLRB,* 5 Cir. 1978, 583 F.2d 765, 771–73. Although we held that "substantial employee turnover is relevant" in choosing among remedies, *id.* at 773, we declined to require "the Board to determine that the actual present sentiment of the majority of the work force favors the union", *id.* If we required that a continuing majority support unionization, an employer with a rapid turnover rate could commit unfair labor practices freely, knowing that a substantial number of new employees would be working by the time the Board held a hearing and that the Board's only remedy would be to issue a cease and desist order and call a new election. The employer could then commit more unfair labor practices during that campaign, and the Board would have to hold a third election. The employer could thus avoid any bargaining obligation indefinitely, and the union would assume the role of Sisyphus, con-

demned in Hades continually to roll a stone up a hill, only to find that it slides down again before reaching the top.

In short, although the existence of subsequent events, such as employee turnover, is a relevant consideration in the decision whether to issue a bargaining order, the Board may determine that other considerations, such as "past union activity, employer responses to such activity, and expressions of employee sentiment such as the signing of union cards", *id.* at 773, require imposition of a bargaining order even when substantial turnover has occurred. A bargaining order is especially appropriate in a case such as this one, where (1) the employer has demonstrated a history of opposition to unionization, thus suggesting that he will commit more unfair labor practices in a subsequent election campaign, and (2) the employer has engaged in a discriminatory refusal to recall an employee, thus indicating that his anti-union animus is responsible at least in part for the employee turnover. *See General Steel Prod. v. NLRB*, 4 Cir. 1971, 445 F.2d 1350, 1357 (Haynsworth, C. J., concurring).

The Board's decision is AFFIRMED, except as to Musewski, and its order is ENFORCED, except as to Musewski.